CITY OF CLEVELAND, APPELLEE, *v.* EGELAND ET AL., APPELLANTS.

(Nos. 50440 and 50441—Decided
April 21, 1986.)

*Brian Fritz,* assistant police prosecutor, for appellee.

*Mark N. Miller,* for appellant Michael Egeland.

*Cain & Cain* and *Elizabeth Cain,* for appellant Daniel Thompson.

MARKUS, J. The defendants appeal from their convictions for aggravated disorderly conduct by lying in the street after officers asked them to move. They both state that they were demonstrating against nuclear warfare and argue that (a) the jury lacked sufficient evidence to support its verdicts, (b) the prosecutor made an improper argument during his summation, and (c) the court imposed an unreasonably excessive sentence. Defendant Egeland also complains that the court restricted questions and denied requested jury instructions about nuclear warfare hazards as a justification for his conduct.

We agree that the court failed to demonstrate its compliance with statutory factors for sentencing. Otherwise, the defendants have shown no prejudicial legal error. Hence, we affirm the convictions but remand the two cases for resentencing.

I

At the trial, the jury heard testimony from the two police officers who arrested the defendants and the defendants themselves. Defendant Egeland then called "experts" on nuclear technology and allegedly inadequate citizen complaint procedures, to support his claim that nuclear dangers justified his conduct.

The police officers testified that protesters against nuclear warfare had conducted an organized demonstration that day. With permits from the city, they had pitched tents on the northwest quadrant of the Public Square and paraded on city streets during early afternoon hours. They had distributed leaflets and expressed their views to passing citizens without police interference.

Both police officers testified about Thompson's conduct. At approximately 4:00 p.m., Thompson and some fifty other protesters lay down in the intersection of Ontario Street and Euclid Avenue. In that position they obstructed traffic on the south side of the Cleveland Public Square. Various officers told the protesters to move from the street and rerouted several hundred cars. Many of the protesters did move from that location, but Thompson remained lying there for twenty minutes.

One of the testifying officers was the police captain in charge of crowd control for that day's organized demonstration. At approximately 4:20 p.m., he knelt next to Thompson and

directed him to move from the street or he would be arrested. Thompson acknowledged that he heard the officer's instruction and stated that he would not comply. The captain then directed two other officers to carry Thompson off the street. One of those officers again requested Thompson to leave the street. He did not, so two officers lifted him and carried him to the sidewalk.

The second officer saw approximately thirty-five of the demonstrators leave the street at Euclid and Ontario shortly before he arrested Thompson. That group moved to the east side of the Public Square where they lay down and obstructed traffic for five minutes. This officer identified defendant Egeland as one of the principal participants in the demonstration. He observed Egeland lying with the demonstrators at the Euclid and Ontario intersection. He noted that Egeland left that location after the officers directed the demonstrators to move.

At 5:30 p.m., this officer saw Egeland lying in the intersection of Superior Avenue and East Roadway on the east side of the Public Square. After Egeland remained there fifteen seconds, the officer told him to move from the street. Egeland failed to move, so the officer carried him off the street. He then transported both Thompson and Egeland to police headquarters.

Defendant Egeland testified that he participated that day in the "No Business As Usual Day" protest against nuclear war. He arrived at the Public Square near noon. His group of "about three dozen" had a permit to march down Euclid Avenue from the Public Square to Cleveland State University. They sought "to inform people of the threat of nuclear war." They carried signs and distributed leaflets without interference. The parade returned to the Public Square where it "broke up." The demonstrators at the Public Square in-creased in number from "fifty or sixty" to "the hundreds" as the afternoon progressed. He and others engaged passersby in conversations about such military activity and its possible effect on Cleveland.

He acknowledged that he was lying in the street for fifteen to twenty minutes on the south side of the square. He claimed that he moved without hearing an officer direct him to do so, because he learned that traffic had been diverted. He then moved to the east side of the square where he and others lay down in the street for a short time. They moved when they again learned that traffic had been diverted.

He then moved around the downtown area with others who carried signs and distributed pamphlets. When he returned to the square, he saw Thompson in the police van and realized that the police had arrested Thompson. He then lay down in front of the van at the place where the police apprehended him. He claimed that he had been there only five seconds when the officer moved him. He stated that others were lying near him at the time. He denied that an officer told him to move, though he said that another protester told him he would be arrested if he did not.

He explained the dangers and consequences of nuclear warfare at great length. He said that his activities that day, including his lying in the street, "was [sic] an attempt to save the world from nuclear destruction." On each occasion that he lay in the street, he knew "it was going to stop traffic." It was symbolic to show that people would die in the street in a nuclear attack. He testified that he felt strongly enough about his views that he was willing "to risk the penalty involved in this case."

Defendant Thompson described his activities that day, beginning at 3:00 p.m. He is a poet, and he read anti-war poems to some of the assembled police

officers and others. He acknowledged that he later lay in the street for twenty minutes as the police diverted traffic around him. He admitted that he was lying in the street when an officer told him to move or be arrested. He told the officer he would not move, and the police carried him away. He also described his concerns about the consequences of a nuclear war which motivated his actions.

Defendant Egeland then called an electrical engineer to describe the engineer's perception of the risks and consequences of nuclear warfare. He also called a law professor to discuss procedures available for public complaint about such matters. Although the court permitted the defendants to explain their conduct, including their beliefs about nuclear war, it restricted some of the "experts'" answers.

## II

Thompson's first assigned error and Egeland's first and fourth assigned errors all challenge the sufficiency of the evidence to support their respective convictions. Section 605.03 of the Codified Ordinances of Cleveland defines the offense for which they were convicted:

"Disorderly Conduct * * *

"(a) No person shall recklessly cause inconvenience, annoyance or alarm to another, by doing any of the following:

"* * *

"(4) Hindering or preventing the movement of persons on a public street, road, highway or right of way, * * * so as to interfere with the rights of others, and by any act which serves no lawful and reasonable purpose of the offender;

"* * *

"(e) Whoever violates this section is guilty of disorderly conduct, a minor misdemeanor. If the offender persists in disorderly conduct after reasonable warning or request to desist, disorderly conduct is a misdemeanor of the fourth degree [also known as aggravated disorderly conduct]."

Both defendants argue that the evidence failed to show that their acts served "no lawful and reasonable purpose of the offender." Defendant Egeland also contends there was no evidence (a) that he was "[h]indering or preventing the movement of persons on a public street" or (b) that he "persist[ed] in disorderly conduct after reasonable warning or request to desist."

While the defendants explained their conscientious motives for their conduct, they did not rebut the city's evidence that they violated this ordinance. While they may have considered their actions most reasonable, their conduct served no "*lawful* and reasonable purpose." (Emphasis added.) One who voluntarily lies in the street with knowledge that he will thereby divert traffic and without a legal privilege to do so is not acting in a "lawful" manner. See R.C. 4511.74.

The offender's conscientious belief in the importance of the subject about which he demonstrates does not provide him with a lawful privilege to obstruct the roadway. Thus, in *Cox* v. *New Hampshire* (1941), 312 U.S. 569, the Supreme Court upheld convictions for parading on the public sidewalk without a license. Writing for a unanimous court, Chief Justice Hughes said at 574:

"Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excess of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The con-

trol of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions. * * *"

The defendants do not contend that the allegedly offensive conduct was part of the parade for which they had a lawful permit. That parade ended hours before their arrests. In any event, the jury could reasonably find that they lacked any "lawful and reasonable purpose." We cannot overturn the jury's verdict if it has support from substantial credible evidence. *State* v. *Eley* (1978), 56 Ohio St. 2d 169 [10 O.O.3d 340], syllabus.

Egeland's separate arguments about the sufficiency of the evidence are equally unpersuasive. Contrary to his contention, there was substantial evidence that he hindered or prevented movement on the public street and that he persisted after being warned or requested to desist. The arresting officer testified that Egeland obstructed prospective movement of a police van stopped behind his position on the roadway. Egeland admitted that he was lying in the van's path, but he asserted that the van was not then ready to move.

More significantly, Egeland knew that he was lying in a heavily used street during the city's rush hour. He admitted that he diverted traffic by lying at the same place one hour earlier and by lying a few minutes before that in a nearby street. Thus, the jury could reasonably find that he obstructed the public street, even if no one attempted to pass over that spot at that instant.

Similarly, the jury could properly find that Egeland persisted in his obstructive conduct after being told to desist. The officer testified that he directed him to move, and that he failed to respond. Egeland denied hearing the officer's instruction but admitted that another demonstrator told him he would be arrested if he did not move. The jury could properly believe the officer's version rather than Egeland's. Moreover, the ordinance increases the penalty if the offender persists in disorderly conduct, whether an officer or someone else warns him or requests him to desist.

Consequently, we overrule the three assigned errors which challenge the sufficiency of the evidence.

### III

As their respective second assignments, each defendant complains about the following argument which the prosecutor made in the rebuttal phase of his summation:

"Ladies and gentlemen, certainly, you heard the testimony in this case. If you go back after hearing that testimony, decide that they are not guilty, tomorrow morning —

"MR. STANLEY [counsel for Thompson]: Objection.

"THE COURT: Overruled.

"MR. FRITZ [the prosecutor]: Tomorrow morning if you get up and want to go to work, get in your car, start to back down the driveway and there is something [*sic*] lying in your driveway —

"MR. STANLEY: Objection.

"THE COURT: Overruled.

"MR. FRITZ: Someone lying at the end of your driveway who wants to make a point about nuclear war —

"MR. STANLEY: Objection.

"THE COURT: Overruled.

"MR. FRITZ: You can't do a thing about it?

"MR. STANLEY: Objection. That's clearly erroneous.

"THE COURT: Overruled. Proceed.

"MR. STANLEY: I'd like a sidebar conference.

"THE COURT: Proceed, Mr. Fritz.

"MR. FRITZ: That's exactly what they were doing, and that's exactly what could happen to you tomorrow morning.

"MR. STANLEY: Objection.

"THE COURT: Overruled."

The court should have sustained Thompson's counsel's objections. The prosecutor cannot properly threaten the jury that an acquittal would jeopardize them personally. *State* v. *Davis* (1978), 60 Ohio App. 2d 355, 361-363 [14 O.O.3d 315] (improper threat that the community will brand jurors as condoning crime); *State* v. *Hill* (1977), 52 Ohio App. 2d 393, 396-397 [6 O.O.3d 436] (improper argument that an acquittal will affect jurors' interests as taxpayers by inviting a malicious prosecution claim). Such arguments ask the jurors to shed their objectivity and to assume the role of interested parties. Cf. *Boop* v. *Baltimore & Ohio RR. Co.* (1963), 118 Ohio App. 171, 174-175 [25 O.O.2d 37]; *Yerrick* v. *East Ohio Gas Co.* (1964), 119 Ohio App. 220, 223 [27 O.O.2d 67] ("golden rule" argument improperly asks jurors to assess damages that they would wish to recover if they sustained the plaintiff's injury).

If the facts in this case were less clear, such an argument could well justify a reversal. However, in this case the evidence against defendant Thompson was essentially undisputed and strongly inculpatory. Improper jury argument which does not inject federal constitutional error requires a retrial only if it deprived the defendant of a fair trial. *Donnelly* v. *DeChristoforo* (1974), 416 U.S. 637; *State* v. *Price* (1979), 60 Ohio St. 2d 136, 140 [14 O.O.3d 379]; *State* v. *Hill, supra,* at 396; *Byrd* v.

*Baltimore & Ohio RR. Co.* (1966), 10 Ohio App. 2d 187, 196 [39 O.O.2d 376]. We cannot say that this improper argument contributed to his conviction, when he admitted that he persisted in deliberately obstructing traffic after being instructed to desist.

Moreover, the defendants' counsel invited this prosecutorial response to their equally improper arguments. See *United States* v. *Young* (1985), 84 L.Ed. 2d 1, 9-12. Thus, Egeland's counsel's jury argument (a) asserted evidence outside the record about demonstrations in other cities in which Benjamin Spock and Carl Sagan participated, and (b) invited the jurors "to participate in nuclear weapons policy." Thompson's counsel argued:

"Here is a map of Cleveland. You've heard the testimony about the areas. You can pick out your own homes and decide if a bomb had occurred on April 29, 1985 at Public Square, whether any of you would be here or your children or your friends or your homes."

He later discussed the *Dred Scott* case (*Scott* v. *Sandford* [1856], 60 U.S. [19 How.] 393), the Nuremberg trials, and the Boston Tea Party before suggesting that "this is the part of the political process where you [the jurors] can have something to say about nuclear policy in this country." In short, the defense counsel gave political arguments and incited a responsive political argument.

Defendant Egeland's contention is even less tenable. His counsel made no objection to the challenged arguments at the trial. When the argument did not assert facts outside the evidence, his failure to object then usually precludes a later complaint about that argument on appeal. *Snyder* v. *Stanford* (1968), 15 Ohio St. 2d 31 [44 O.O.2d 18], paragraph one of the syllabus; *Norwood* v. *Forest Converting Co.* (1984), 16 Ohio App. 3d 411, 419-420.

Thus, we overrule each defendant's second assignment of error.

## IV

Egeland's fifth assignment contests the court's restrictions on evidence about nuclear dangers and its refusal to instruct that such dangers could justify Egeland's conduct. He asserts that those dangers created a legal defense of "necessity" to violate the law.

He cites no Ohio authority for his contention that great public danger justifies all demonstrations to alert the public, no matter what their consequences. Certainly, every person has the right if not the duty to exercise free speech to alert others about perceived public dangers. These defendants exercised their lawful rights of free expression by marching in a licensed parade, carrying signs, distributing literature, addressing passersby, and reading poetry.

Their right to communicate and persuade did not include the right to trespass on other persons' free movements. Traffic obstructions create greater risks of injury and property damage. If a perceived danger justified all types of demonstrations, demonstrators might injure or kill others to emphasize that nuclear warfare would have those consequences. Certainly, the defendants would not claim that demonstrators could do so with impunity.

Ohio recognizes one's privilege to use force in self-defense, when one faces an immediate threat of serious physical harm. State v. Robbins (1979), 58 Ohio St. 2d 74 [12 O.O.3d 84], paragraph two of the syllabus. Ohio does not recognize a privilege to trespass on another's rights, no matter how trivial they may be, in order to assert a cause, no matter how profound it may be. There is no evidence that these defendants faced any immediate threat of physical harm. The court ultimately permitted each of the defendants to explain his concern about nuclear warfare in considerable detail. The defendants apparently asserted that this evidence had possible relevance to their claims that they acted reasonably in light of their beliefs. The proffered expert testimony about these matters provided no relevant evidence, since it did not explain the defendants' state of mind. The jury had no reason to determine the true extent of the nuclear danger, since that danger could not be a defense in this case.

The court did not abuse its discretion by excluding that proposed expert testimony. It did not err by declining to instruct the jury about a defense which Ohio does not recognize. Therefore, we overrule Egeland's fifth assignment.

## V

Each defendant asserts as his third assignment of error that the trial court abused its discretion by imposing an excessive sentence. As a fourth degree misdemeanor, the maximum punishment for this offense is thirty days in jail or a fine of two hundred fifty dollars, or both. The court rejected the request by Thompson's counsel for a presentence investigation and imposed sentence immediately after the jury returned its verdicts. The court sentenced each defendant to the maximum lawful imprisonment, thirty days in jail. In addition, despite a representation by Thompson's counsel that Thompson was indigent, the court sentenced each defendant to pay a one hundred dollar fine.

The Revised Code supplies statutory standards for the trial court's exercise of its discretion in imposing a sentence for a misdemeanor offense. Pertinent parts of R.C. 2929.22 provide:

"* * *."[1]

The factors which militate for shorter imprisonment for a felony pur-

---

[1] The text of the opinion as it appears herein was abridged by Judge Markus.

suant to R.C. 2929.12(C), and against imprisonment for a misdemeanor pursuant to R.C. 2929.22(C), include the following:

"(1) The offense neither caused nor threatened serious physical harm to persons or property, or the offender did not contemplate that it would do so;

"(2) The offense was the result of circumstances unlikely to recur;

"* * *

"(4) There are substantial grounds tending to excuse or justify the offense, though failing to establish a defense;

"(5) The offender acted under strong provocation;

"(6) The offender has no history of prior delinquency or criminal activity, or has led a law-abiding life for a substantial time before commission of the present offense * * *."

* * *

In a nation governed by laws rather than persons, judges have no prerogative to substitute their own standards for legislatively created principles. The judge's exercise of discretion in sentencing an offender is not a matter of whim or fancy. It involves a conscientious effort to evaluate all aggravating and mitigating factors before selecting from legislatively authorized choices. By avoiding that process, the judge fails to exercise the allotted discretion. Arbitrariness is the antithesis of discretion.

In the present cases, multiple mitigating factors militate for less than the maximum jail sentence. See R.C. 2929.12(C)(1), (2), (4), (5) and (6); and R.C. 2929.22(C). The offenders were engaged in civil disobedience to publicize their apparently strong beliefs about important public policy issues. If they had successfully challenged a constitutionally defective law, they could not be punished. Cf. *Edwards* v. *South Carolina* (1963), 372 U.S. 229. If they violated a valid law to dramatize their views, they should expect punishment even though they believed their cause

was just. See Gandhi, Non-Violent Resistance (1951) 3-4; Thoreau, Civil Disobedience (1966 Ed.) 233-235.

However, the government should not be vindictive in punishing those who seek to assert their conscientious views, even if they do it in a misguided manner. Their motives for their illegal conduct do not justify the conduct, but those motives may be mitigating factors when determining an appropriate punishment. R.C. 2929.12(C)(4) and (5). The maximum jail sentence exceeded reasonable limits, in light of (a) the defendants' motivations, (b) the lack of any actual injury to persons or property, (c) the absence of any significant adverse criminal history, and (d) the unlikelihood that the offenders will frequently repeat this offense. In light of defendant Thompson's reported indigency, the fine assessed against him was unreasonable.

Therefore, we sustain each defendant's third assigned error and vacate the sentences imposed. We affirm the defendants' convictions but vacate their sentences and remand the cases for resentencing.

*Judgment accordingly.*

KRUPANSKY, J., concurs.

PARRINO, C.J., dissents.

PARRINO, C.J., dissenting. I respectfully dissent from the majority's disposition of appellants' second assignment of error (Part III of the majority's opinion).

In his closing argument to the jury the prosecutor, over objection, stated that if they returned a verdict of not guilty, the jury, and by implication, other residents of the community, could expect nuclear protesters to be lying in their driveways the following morning thereby preventing passage to and from their homes. The majority concedes that this argument constituted error but maintains that under the facts in this case such conduct constituted harmless

error. It is my opinion that the error was prejudicial and violated defendants' right to a fair trial.

Clearly, this argument called upon the jurors to depart from their obligation of fairness and neutrality and was a blatant appeal to passion. It was designed to inflame the jurors against the defendants. It called upon the jury to convict the defendants because their failure to do so would result in a license to nuclear protesters to demonstrate in the same way at the jurors' homes. This argument by the prosecutor was highly inflammatory and prejudiced the defendants.

Based upon this analysis I would sustain appellants' second assignment of error, reverse appellants' convictions and remand this cause to the trial court for further proceedings according to law.