The STATE of Ohio, Appellee,

v.

HALL, Appellant.

[Cite as *State v. Hall* (1995), 106 Ohio App.3d 183.]

Court of Appeals of Ohio,
Second District, Montgomery County.

Nos. CA–14103, CA–14825.

Decided Sept. 1, 1995.

*Carley J. Ingram,* Montgomery County Assistant Prosecuting Attorney, for appellee.

*Robert B. Coughlin,* for appellant.

FREDERICK N. YOUNG, Judge.

Steve Hawkins Hall appeals from his conviction, following a trial by jury, of the shooting and robbery of Derrick Chapman. He was sentenced to serve eight to fifteen years for felonious assault, three to fifteen years for robbery, and two to five years for possessing weapons while under a disability. Each of the three counts also carried firearm specifications, which were merged, and which added three years of actual incarceration to his sentence. His sentences for felonious assault and weapons possession were to be served concurrently with one another, and consecutively to the other sentences, making a total indefinite sentence of fourteen to thirty years of incarceration.

In his original appeal, he alleges that he was denied a fair trial by prosecutorial misconduct and the ineffective assistance of his trial counsel. While his original appeal, Montgomery App. No. CA–14103, was pending in this court, Hall sought and won leave to file a motion for a new trial in the trial court. When that motion was ultimately denied, Hall filed a new appeal, Montgomery App. No. CA–14825. Both appeals are now consolidated for review.

I

Derrick Chapman was awakened around 4:00 a.m. on November 4, 1992 by a loud and insistent banging on the front door of an apartment he shared with Kennetha Norman, her two children, and their dog. He rose to answer it, and found three men in hooded sweatshirts standing on his front porch, one of whom asked him for a man called Dana Dane. Chapman immediately recognized the speaker as Steve (Hall), to whom Norman had introduced him a few weeks before. He replied that Dane (a.k.a. Dayne Wilson) was not there, but suggested that he might be found next door. Hall then began to remove a gun from his trousers. When Chapman tried to close the door, he was seized and dragged out onto the front porch, pistol whipped, and shot in both legs with a .22 caliber weapon. Hall and one of his accomplices dragged Chapman back into his house, robbed him of $50 he had in the pocket of the shorts he had slept in, and proceeded to ransack the house. Chapman fled down the steps to the basement, as one or both of the men shot after him repeatedly, and escaped through another exit.

Norman, the children, and the dog meanwhile escaped through the back door. Once outside, Norman was able to persuade a couple who were driving by to take her and the children to a nearby cousin's house. As they drove, Norman spotted Wilson standing on the street corner "with his hands in his pockets, and he had a gun in his pocket." She announced this to the couple, who then "stopped at the corner with their stupid self trying to be nosy," so that Wilson saw her cowering in the back seat. Norman urged the couple to drive on as she watched Wilson take a small handgun out of his pocket and wave it in the air. She testified at trial that Wilson must have been the "lookout man" for Hall and his two accomplices.

Chapman identified the man who shot him as "Steve" when interviewed by Officer Erick Brown at the crime scene, and described him to Officer Brown as a black male about five feet ten inches tall and two hundred ten pounds. He explained at trial that he referred to his assailant by his first name only because at the time he gave his report, he did not know Hall's last name. Chapman testified that Norman had introduced him to Hall, and that he had run into him a few times during the two or three weeks before Hall shot him.

Norman testified that she knew Hall well, and that they used to be friends. Though she never saw Hall during the shooting or the break-in, she heard and recognized his voice when Chapman answered the front door, and again when Hall shouted after her as she and the children fled through the back door.

Three weeks after the shooting, it so happened that both Chapman and Hall were scheduled to appear in other criminal proceedings at the Montgomery

County Courthouse at the same time. Hall had not yet been arrested for shooting Chapman. As Chapman walked down the corridor to the courtroom he was to appear in, he spotted Hall seated on a bench. Hall recognized Chapman and began "shaking like a jackrabbit." When he made as though to leave, Chapman called for the police to stop him. Officer Briesch arrived, made some inquiries, and on discovering that Chapman's felonious assault complaint "listed suspect number one as having a first name of Steve, and [that] the description [on the complaint] matched that of Mr. Hall," placed Hall under arrest.

Hall's defense centered on the contention that Chapman was not certain who had shot him, or he would have told the police Hall's last name, which Chapman maintained he learned from Norman very shortly after Officer Brown took his statement. Hall also introduced the testimony of Greg Stollings, who stated that Chapman spoke to him three or four days after the shooting, and said that his assailant was Wilson.

Monique Littlejohn was Hall's girlfriend and alibi witness. She averred that he was at home with her all night November 4, 1992. Hall, testifying on his own behalf, said that he never met Chapman before November 25, 1992, the day he was arrested, and that he introduced himself to Chapman there in the hallway of the courthouse and was very surprised when Chapman suddenly "ran and called the police."

## II

Hall assigns two errors to his conviction and sentence in App. No. CA–14103:

"The prosecutorial misconduct which occurred in this case, under the totality of the circumstances and given its cumulative effect, denied * * * appellant a fair trial."

"Defendant was denied effective assistance of counsel, which resulted in prejudice to him, because of trial counsel's failure to raise objections to improper impeachment evidence, improper prior bad acts evidence, and improper character evidence, improper actions by the prosecution, and also by his counsel's admission into evidence of improper impeachment evidence against his own witness, [and] admission by his counsel of other evidence prejudicial to him."

These broad categories of alleged error arise out of essentially the same facts in the record. Hall asks us to examine the first category under plain error, and the second under the standard of review appropriate for ineffective assistance of counsel claims. In the interests of judicial economy, we will consolidate them for review and determine whether any particular failure to respond to error rendered trial counsel's assistance to Hall constitutionally ineffective.

In order to prevail on a claim of ineffective assistance of counsel, Hall must demonstrate that his trial counsel committed errors so egregious that he was "not functioning as the 'counsel' that the Sixth Amendment guarantees." *State v. Cook* (1992), 65 Ohio St.3d 516, 524, 605 N.E.2d 70, 80. The errors complained of must amount to a " 'substantial violation of * * * defense counsel's essential duties to his client.' " *State v. Bradley* (1989), 42 Ohio St.3d 136, 141, 538 N.E.2d 373, 379, quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396, 2 O.O.3d 495, 497–498, 358 N.E.2d 623, 626–627. When reviewing counsel's conduct of a defense, "[t]rial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." *State v. Cook, supra,* 65 Ohio St.3d at 524–525, 605 N.E.2d at 81. Even if defense counsel did violate some essential duty to Hall, he must yet show that, were it not for his counsel's unprofessional errors, there is a reasonable probability that he would not have been convicted. *State v. Bradley, supra,* paragraph three of the syllabus.

We have thoroughly examined the record for the score or so instances of misconduct and ineffective assistance Hall alleges, and we find that two merit discussion.

The state attempted to impeach Hall and his alibi witness, Littlejohn, by reference to the fact that they had a number of illegitimate children together, and that Littlejohn at least was receiving welfare to help support them. On cross-examination, Littlejohn was asked whether she had informed the welfare department that Hall lived with her, and whether she realized that her failure to do so was a felony offense. Hall was questioned about his relationship with several women, one of whom, referred to only as Shiree, was not a witness and had no connection whatever with the November 4, 1992 shooting. It was nevertheless brought out that Hall had fathered illegitimate children with her, as well.

In closing argument, the state summed up the testimony as follows:

"But let's look at the other witnesses. Monique [Littlejohn], I thought it was pretty interesting that she got on the stand and admitted that she's in the process of committing a felony, welfare fraud. She told you she knew she wasn't allowed to have Derrick [*sic,* Hall] at her house. She's on ADC. She's having babies to get more money for ADC. He's fathering them. It's a wonderful system we've got. And she's going to marry him if it comes to that. Can't marry him, well. Let's just say she has a real interest in this. She has an interest in what happens to him."

A witness may be impeached during cross-examination by reference to specific instances of conduct "if clearly probative of truthfulness or untruthful-

ness." Evid.R. 608(B). Allegations of fraud, if admitted to, clearly indicate that the witness is not a truthful person. There does not appear to have been any impropriety in the state's cross-examination of Littlejohn on this point. However, in our view, the state's use of this otherwise permissible impeachment evidence during closing argument goes beyond impugning Littlejohn's character for truthfulness or demonstrating her interest in the outcome of the case. It implies that Hall is actively participating in a scheme to indiscriminately father children who will become public charges. Hall had admitted to having three children by Littlejohn, and more by Shiree.

Such argument urged the jury to convict by encouraging them to consider the consequences of an acquittal. The insinuation was that Hall's release would necessarily mean that he was at liberty to produce more illegitimate children for the taxpayers to support. It "ask[ed] the jurors to shed their objectivity and to assume the role of interested parties." *Cleveland v. Egeland* (1986), 26 Ohio App.3d 83, 88, 26 OBR 258, 262, 497 N.E.2d 1383, 1389. The state's remarks were irrelevant to whether the evidence demonstrated that Hall shot Chapman. They were inflammatory and certainly improper. See *State v. Hill* (1977), 52 Ohio App.2d 393, 397, 6 O.O.3d 436, 438–439, 370 N.E.2d 775, 779; and *Commonwealth v. West* (1986), 358 Pa.Super. 609, 518 A.2d 307.

█ Hall's trial counsel withdrew an objection relating to Hall's relationship with Shiree, and did not object to that portion of the state's closing argument implicating Hall in welfare fraud. However, counsel's errors, even if they violate some essential duty owed to Hall, do not constitute reversible error unless it can be shown that there is a reasonable probability Hall would not have been convicted without them. Hall has failed to make that showing. The state's case against Hall rested largely on Chapman's testimony, but his testimony was corroborated in nearly every detail by other witnesses, several of whom were neighbors who did not know either Chapman or Hall well. We cannot say that the state's case was so weak that the prosecutor's comments shake our confidence in the soundness of Hall's conviction.

█ Likewise, we observe that it is improper for a prosecutor to offer her personal opinion as to the veracity of a witness during closing argument, *State v. Lewis* (1990), 70 Ohio App.3d 624, 639, 591 N.E.2d 854, 864, though she may properly suggest that the evidence in the record belies a witness's testimony. In summing up Hall's demeanor and testimony, the prosecutor remarked, "It was very self-serving. It was like a puppet rocking. 'No, I didn't do that, yes, no, yes, no. I didn't shoot him. I didn't go on Drake. I never left Monique's side.' It was not credible to me. The reason we had the probation officer is he said, 'Well, the only thing I did was miss one appointment.' Well, you heard he didn't do anything he was supposed to, didn't go to two programs. That means, ladies

and gentlemen, he's not telling the truth about that, and my position is he's not telling the truth about the rest of it, either."

█ It was permissible for the state to point out that the rebuttal testimony of the probation officer showed that Hall had cast himself in a falsely flattering light when he understated the reasons for his probation revocation. However, the prosecutor's comments that the rest of Hall's testimony was not credible to her were irrelevant and improper. Hall's trial counsel neither objected to this argument nor asked the court for a curative instruction. Nevertheless, we cannot conclude that the state of the evidence was such that, had a timely objection been lodged, it is reasonably probable that the jury would not have convicted Hall.

Hall's first and second assignments of error in App. No. CA–14103 are overruled.

### III

"The trial court erred by overruling appellant's motion for a new trial."

In late December 1993, some six months after Hall's conviction, his appellate counsel discovered that a .25 caliber handgun had been recovered from Wilson back in April, roughly the time Hall was being tried. When appellate counsel compared this information with Norman's testimony that Wilson had apparently been at least peripherally involved with the break-in and shooting, he moved for an opportunity to bring a motion for a new trial, suggesting that perhaps Wilson might have been the assailant rather than Hall.

Crim.R. 33(B) provides that a motion for a new trial on the basis of newly discovered evidence must be brought "within one hundred twenty days after the day upon which the verdict was rendered," which in this case was May 27, 1993. Hall's appellate counsel moved for leave to file on February 10, 1994, well beyond the one-hundred-twenty-day time limit. The trial court, in the exercise of its discretion, may grant permission to file out of time provided that the movant is able to show by "clear and convincing proof that [he] was unavoidably prevented from the discovery of the evidence upon which he must rely." Crim.R. 33(B). The trial court in this instance implicitly found that this requirement was met, as it granted Hall leave to file his belated motion.

Appended to Hall's motion for a new trial were the affidavits of Robert Coughlin, Hall's appellate counsel, Stollings, James Snowden, a cellmate of Wilson's in May 1993, Kathy Lock, records keeper at the Montgomery County Jail, and of Hall himself. These affidavits give widely divergent accounts of who

was responsible for shooting Chapman, who claimed responsibility for shooting Chapman, and who Chapman claimed had shot him. The most charitably coherent construction that could be placed on them was placed there by the trial court in considering the merits of the motion. "Defendant bases his motion upon trial testimony which placed Dayne Wilson at the Chapman scene holding a weapon. Wilson was later arrested and a weapon was confiscated. Defendant also maintains Wilson admitted to the Chapman shooting to others. Based on these facts, Defendant requested tests be conducted to compare the shell casings of the two guns." Decision Overruling Motion for New Trial, September 6, 1994, Doc. No. 22. The court noted that the shell casings and the spent bullet, which had been recovered from the porch, were from a .22 caliber gun, just as Officer Thomas Ullrich had testified at Hall's trial. The gun recovered from Wilson was unquestionably a .25 caliber weapon. The court denied the motion.

A trial court abuses its discretion in denying a motion for a new trial if the new evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." State v. Petro (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370, syllabus. Hall's appellate counsel makes essentially the same arguments to this court that he made to the trial court, urging that there is a strong probability that the evidence he alleges is newly discovered would lead a newly impanelled jury to conclude that someone other than Hall (presumably Wilson) shot Chapman. We disagree.

Assuming arguendo that Wilson's connection to the shooting and the contents of the affidavits Hall's appellate counsel filed with the trial court could not have been explored by Hall or by his trial counsel long before now, we still conclude that, given the state of the record, there is no probability that they would produce a different result in a new trial. Nothing in the affidavits suggests that Wilson would be willing to testify at a new trial that he was responsible for shooting Chapman. It does not appear that any affiant's testimony to this effect would be admissible evidence. See Evid.R. 804(B)(3). In addition, the fact that the shell casings and the spent bullet found on the front porch came from a gun of a different caliber than that recovered from Wilson rather suggests that Wilson did not shoot Chapman than that he did.

Hall's appellate counsel nevertheless contends that the evidence is suggestive enough to cause a different result at a new trial free of prosecutorial misconduct, given what he alleges is the weakness of the state's case against Hall. We have

dealt with Hall's allegations of prosecutorial misconduct above. Hall's appellate counsel's argument is yet remarkable, however, not for any merit in it, but for how horribly it mischaracterizes the record.

He alleges that Norman and Chapman "never advised anybody on the night of the shooting of the identity of their assailant. It was only weeks later, during a chance encounter at the Montgomery County Courts Building, where both appellant and Chapman were for their respective, unrelated cases, that Chapman 'realized' who had shot him and that his name was Steve Hawkins Hall." He states later that weeks passed "after the shooting, and before [Chapman's] identification of appellant as his assailant." Later still he refers to Chapman's "inability to identify anybody as the perpetrator of the crime for weeks after the shooting."

Hall's appellate counsel then buttresses the importance of Wilson's .25 caliber gun with a disingenuous construction of Norman's testimony:

"The recovery of a similar caliber weapon to that used in the shooting from Wilson, only months after the shooting, is powerful evidence to a jury when considered along with * * * the testimony of Norman at trial wherein she identifies Wilson as being at the scene of the shooting with a small caliber handgun within minutes of the shooting. It is both material to the issue of identity, not merely cumulative, and it does also impeach the testimony of Chapman about who was present at the time of the shooting as he never testified that Wilson was present."

He continues, attempting to anticipate the state's reply to his argument:

"The prosecution will argue that such evidence proves only that two (2) guns were used during the shooting. The prosecution will argue that Wilson had the .25 caliber handgun, and appellant had the .22 caliber handgun. This the prosecution will argue in an effort to explain why both appellant and Wilson could have been at the scene of the shooting, using different handguns, as it is obvious that Chapman was shot. However, it must be remembered that the defense of this case was alibi—appellant testified that he was not at the scene of the shooting—and it must be further remembered that Chapman never identified Wilson as being at the scene of the shooting with a handgun pointing at Chapman."

Finally, Hall's appellate counsel points out that "Chapman testified that he was 'dragged' out onto the front porch where he was shot twice by the same person with the same gun. * * * Chapman and Norman, plus other witnesses, testified that many shots were fired, 'until the clip was empty,' as described by Chapman,

yet only two shell casings and one partial bullet were found at the scene on the porch."

What the record very plainly discloses is this: Chapman identified his assailant as "Steve," whose last name he did not know at the time, and described him in a report he gave to Officer Brown at the crime scene immediately after the shooting. This fact was uncontested, and there is nothing in the record to gainsay it now. Furthermore, neither Norman nor any other witness testified that Wilson was either a bystander or a participant in the shooting that occurred on the front porch. Norman merely testified that she saw Wilson on a nearby street corner, and surmised that he must have been the lookout man for those who were on the front porch conducting the break-in and shooting. Therefore, it should not be surprising that Chapman did not testify that Wilson was among the three men who broke into his apartment, dragged him out of it, and pistol whipped and shot him. It is evident that Wilson simply was not there. The state certainly would not (and did not) attempt to argue otherwise.

Finally, it is plain from the record, and was uncontested, that Chapman was shot while he and his assailants were on the front porch. Chapman, Norman, and several neighbors testified with remarkable consistency that only two or three shots were fired on the front porch. Therefore, one would not expect to find more than two or three shell casings or spent bullets there. The testimony Hall's appellate counsel refers us to relates to a barrage of shots that Chapman, Norman, and several neighbors testified was fired *inside* the house, after Chapman had been wounded on the front porch. Accordingly, the number of shots fired in the house, and the caliber of the gun or guns that fired them, is a matter of complete indifference.

In sum, Hall's appellate counsel has, in trying to persuade this court of the weakness of the state's case against Chapman, shamefully misrepresented the record. His appeal from the court's denial of his motion for a new trial, in light of the record, and particularly the fact that Wilson's gun was certainly not used to fire the bullets that wounded Chapman, is frivolous. His sole assignment of error in App. No. CA–14825 is overruled.

The judgment of the trial court is affirmed in all respects.

*Judgment affirmed.*

BROGAN, J., concurs.

GRADY, J., concurs separately.

GRADY, Judge, concurring:

I do not agree with Judge Young that the state was entitled by Evid.R. 608(B) to impeach Monique Littlejohn by interrogating her concerning a possible welfare fraud offense. Every witness who testifies under oath puts his or her credibility into issue. Evid.R. 616 permits impeachment of any witness on any relevant issue, including credibility. Evid.R. 608(B) permits the use of specific instances of misconduct for impeachment, if they are clearly probative of truthfulness or untruthfulness. Fraud is probative of those issues. However, Evid.R. 609(A) prohibits use of evidence of a criminal offense for impeachment purposes unless it has resulted in a conviction. "Except for the provisions of Rule 609 respecting conviction of a crime, collateral or extrinsic evidence of such instances of bad conduct is not admissible. This limitation is consistent with prior Ohio law. *State v. Cochrane* (1949), 151 Ohio St. 128, 38 O.O. 575, 84 N.E.2d 742." Staff Note to Evid.R. 608(B), July 1, 1992 Amendment. Nevertheless, I agree that the defendant's failure to object waives any error, and that no plain error is evident under the outcome-based standard of *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

I most emphatically do agree that the prosecutor's closing remarks about Littlejohn and the defendant were improper. "She's on ADC. She's having babies to get more money for ADC. He's fathering them. It's a wonderful system we've got." These are statements calculated to invoke the passion and prejudice of the jury concerning one of the most controversial issues of the day. They were not authorized by Evid.R. 616 or any of the other Rules of Evidence concerning methods of impeachment. Had the defendant objected, failure to sustain the objections would be reversible error. Even had an objection been sustained a mistrial could be warranted. Neither motion was made, and so the state is saved by the plain error analysis. However, counsel should remember that prosecutorial misconduct can constitute a violation of the Code of Professional Responsibility that courts are encouraged to refer to the Supreme Court's Disciplinary Counsel. *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542.