OPINION
{¶ 1} This case is before the court on the appeal of Casey Young from his conviction, after a jury trial, on two counts of abduction, one count of aggravated burglary, and two counts of felonious assault. Young was sentenced to two years on each abduction charge, and six years each on the remaining charges. Since some terms were imposed concurrently and some were imposed consecutively, Young's total prison sentence was 14 years. The State has also filed a cross-appeal, based on the trial court's refusal to classify Young as a sexually oriented offender.
 {¶ 2} In support of his appeal, Young presents the following assignments of error:
 {¶ 3} "I. The trial court erred in overruling counsel's motion for acquittal where the record demonstrated that Appellant was a family/household member and the State acknowledged as much in its pleadings herein.
 {¶ 4} "II. The trial court erred in permitting the prosecutor to argue her version of criminal procedure in closing argument and in denying defense counsel the opportunity to make relevant arguments based upon the evidence presented at trial."
 {¶ 5} Additionally, the State's cross-assignment of error alleges that R.C. Chapter 2950 is not unconstitutional as applied to persons who commit listed sexually oriented offenses upon persons under eighteen without any sexual motivation or purpose.
 {¶ 6} After reviewing the record and applicable law, we find no merit in either the assignments of error or the cross-assignment of error. Therefore, the trial court judgment will be affirmed.
 I {¶ 7} The charges against Young arose from incidents that occurred on two separate occasions, and were the subject of separate indictments. The indictments were later joined for trial. One set of indictments involved the abduction of Shamon Clark's two young sons, Crisshawn and Demarco Clark. At the time of the abduction (on July 11, 2001), the boys were ages 6 and 2, respectively.
 {¶ 8} Before the abduction, Shamon and Young had dated off and on for about two years. Young was not the children's' legal father, but had known them almost all their lives. Shamon and Young broke up at some point before July 11, 2001, and Shamon then was involved with a new boyfriend. On the day of the abduction, Young saw Shamon in her new boyfriend's car. Young told the driver of his car to follow Shamon, and a chase ensued. Ultimately, Shamon pulled into a Sunoco gas station, where her car was blocked by the other vehicle. At that point, Young got out and ran over to Shamon's car. After diving through the passenger side window, Young hit Shamon, and also bit her in the face. Shamon then got out of the car, and refused to get back in. The children were still inside, and Young threatened to take the children if Shamon did not get back into the car. As Shamon pleaded for the children to be released, Young drove the car away from the gas station, with the children inside. The children were eventually returned unharmed a few hours later.
 {¶ 9} Following the abduction, Shamon continued to see Young romantically, and even gave Young a sweater for his birthday, which was about a week later, on July 18. A few days or a week after the abduction, Shamon also filled out paperwork to drop the charges against Young. This was done at Young's request, although Shamon admitted she was not coerced. Shamon did not then see Young between August 1, 2001, and November 20, 2001. There was evidence from Young's mother, if believed, indicating that Shamon and Young continued to communicate and see each other after August, 2001. In fact, Young's mother testified that she had taken Young to Shamon's apartment a few days before November 20, 2001, and had picked him up the following morning.
 {¶ 10} The significance of November 20, 2001, is that a second incident occurred that day. Up until November, Shamon was under the impression that the original charges against Young had been dropped. However, she learned otherwise after reading about the charges in the local newspaper. Shamon also heard from Young, who was upset that charges were still pending. Young again demanded that Shamon drop the charges. After talking with Young, Shamon went to the prosecutor's office, but was not successful in getting the charges dismissed. At that point, Shamon told Young that she would have to wait and call the prosecutor back. Young was not satisfied with Shamon's efforts, and was upset.
 {¶ 11} The day after Shamon went to the prosecutor's office, she was in her apartment with a male friend (James Jackson), and her two children. Young called the apartment and was upset about the charges not being dropped. He also asked Shamon who was there. At that time, Shamon lied, telling Young that no one was there, and that she was about to leave. She did not tell Young another man was present, because she was scared. About fifteen minutes later, someone knocked on the apartment window. The apartment building had an outside security door that could be opened only with a key or from the inside. Since Jackson was expecting someone to come over, he went out in the hall to open the security door.
 {¶ 12} When Jackson opened the door, Young ran towards him, holding a knife. Young told Jackson to leave, and started trying to kick in Shamon's apartment door. After failing to get in the door, Young ran up behind Jackson and stabbed him in the back and arm with a knife. Jackson ran to a neighbor's house, where he collapsed. At this point, Young threw a concrete block through Shamon's window and entered her apartment. During the ensuing struggle, Young stabbed Shamon in the arm and hip. He then left the scene.
 {¶ 13} The events of November 20, 2001, led to a second set of indictments, in which Young was charged with aggravated burglary and two counts of felonious assault. Ultimately, the indictments were joined, on the State's motion. The trial court's reason for allowing joinder was that the two events indicated a course of criminal conduct. Additionally, the court held that evidence about the threats and Shamon's stabbing would be properly admitted in the abduction case as intimidation of a witness. Similarly, evidence about the abductions and Shamon's failure to drop the abduction charges would be properly admitted to show a motive for the subsequent felonious assaults. Accordingly, the trial court held that joinder was appropriate and would not prejudice Young. The joined cases were then tried before a jury.
 {¶ 14} After the State presented its case at trial, Young moved for a Crim. R. 29 acquittal on the abduction charges, claiming that he, Shamon, and the children were a "de facto" family, and that he had an implied privilege to remove the children because of that relationship. The trial court overruled the motion, and Young was convicted, as we said, on charges of abducting the two children.
 {¶ 15} On appeal, Young contends that when the State moved to join the indictments, it took the position that Young was Shamon's family member. Young believes the State should be bound by its admission, and could not later disavow the status.
 {¶ 16} Under Crim R. 29(A), the court may acquit the defendant of one or more offenses alleged in the indictment, "if the evidence is insufficient to sustain a conviction of such offense or offenses." When we review the sufficiency of evidence to support a conviction, we:
 {¶ 17} "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, 259-60, paragraph two of the syllabus.
 {¶ 18} As pertinent to this case, the elements of abduction are that "[n]o person, without privilege to do so, shall knowingly do any of the following: (1) By force or threat, remove another from the place where the other person is found * * *." R.C. 2905.02(A). Privilege is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).
 {¶ 19} After reviewing the evidence, we find that any rational trier of fact could have found the elements of abduction, including the absence of privilege, proven beyond a reasonable doubt. As an initial point, we reject the claim that the State made a judicial admission about privilege when it moved to join the two sets of indictments. In this regard, Young relies on the State's comment in its motion to join that "[b]oth cases involve the continual domestic abuse and terrorization of Ms. Clark, who has been a family or household member of the defendant within the past five years."
 {¶ 20} For an allegation in a pleading to operate as a judicial admission, it must be "`an allegation of a material and competent fact and not a mere statement of a legal conclusion.'" Triplett v. LibertyMut. Ins. Co. (Nov. 9, 2000), Lucas App. No. L-99-1340, 2000 WL 1675509, *8, quoting Faxon Hills Construction Co. v. United Brotherhood ofCarpenters and Joiners of America (1958), 168 Ohio St. 8, 10-11. Furthermore, counsel's statements "do not rise to the level of a judicial admission where there is no indication that the statement was intended to dispense with formal proof of material facts." Holeski v. Lawrence
(1993), 85 Ohio App.3d 824, 833.
 {¶ 21} In the present case, the State's comment was not intended to dispense with formal proof of material facts at trial. Instead, the State was simply attempting to have two indictments joined. Young argues that the State is not free to repeatedly change the theory of its case, but that is not what occurred. The State did not alter its theory. From beginning to end, the State did not deny that Young and Shamon Clark had a romantic relationship, and may have even lived together at some point (although the actual evidence on this latter point was quite sparse). However, the State's theory of the case was that Young's actions were motivated by jealousy and possessiveness, and (in the case of the stabbing incident), anger over the fact that the earlier charges had not been dismissed. This theory is completely consistent with the State's assertion that Young was Shamon's family or household member within the past five years.
 {¶ 22} Furthermore, to the extent that the statement may have been factual, rather than a legal conclusion, it was not material to the issue of privilege. Specifically, even if Young was a family or household member within the past five years, that does not mean he had an implied privilege to take the children from their mother's care.
 {¶ 23} State v. Matthews (Dec. 5, 1996), Seneca App. No. 13-96-23, 1996 WL 700273, involved a situation similar to the present. In that case, a woman left her husband of three months after an argument, and went to her sister's trailer. Id. at *1. She took her five year old son with her, who was not her husband's biological child. During an ensuing argument, the husband took the child from its mother and drove away. The child was returned to its mother the same day, and the husband was subsequently charged with abduction. Id.
 {¶ 24} The husband claimed an implied privilege, because he had taken the child on multiple prior occasions without the mother's permission. He also contended that he had a parental privilege because he stood in loco parentis for years before the abduction incident. Id. at *2. However, the Third District Court of Appeals disagreed. The Third District found such evidence irrelevant, since the defendant did not have a legal right to custody, and since the mother had revoked all express or implied privileges on the day of the abduction. Id.
 {¶ 25} We agree with the Third District's reasoning and reach the same conclusion regarding Young's claims. In the present case, there was no evidence of even an implied privilege, as Young failed to provide evidence that he had permission to take the children anywhere without their mother — or, in fact, that he had ever done so. The most that could be inferred from the testimony is that Young may have lived with Shamon and her children off and on for some unspecified period of time during the two years before the abduction. He may also have given the children swimming suits and a used bicycle.
 {¶ 26} More important, even if some type of privilege had existed, it was clearly revoked by Shamon Clark when her children were forcibly removed, against her will, from the Sunoco gas station. Accordingly, the first assignment of error is without merit and is overruled.
 II {¶ 27} In the second assignment of error, Young claims that the trial court erred in letting the prosecutor argue facts that were not in evidence. According to Young, this error was compounded by the court's failure to let Young's attorney argue certain inferences arising from the fact that Shamon gave Young a birthday gift shortly after the abduction.
 {¶ 28} The following matters took place in closing argument. During the State's argument, the prosecutor discussed the fact that for a time in the summer of 2001, Shamon was free of Young. In this context, the prosecutor said:
 {¶ 29} "She told you he didn't really know where she was. She thought probably the charges had been dropped and life was good. Until a time in November when the defendant found out that those charges still existed and all of a sudden there was an urgency to get those charges dropped and, again, the undercurrent of `or else.' So Shamon goes downtown again, only in the State of Ohio, a case is just not dismissed because a victim asks for it to be. It doesn't work that way."
 {¶ 30} The defense made an objection at this point, which was overruled. The prosecutor then went on to discuss Young's unhappiness over the fact that the charges were not dismissed, and the subsequent stabbing incident that took place.
 {¶ 31} Although no witness testified about the procedural requirements for dismissing a criminal case, the gist of what the prosecutor said can be inferred from the evidence. In this regard, Shamon testified that she went to the prosecutor's office in November to ask that the charges be dropped. At that time, she was told that the prosecutor could not do anything about it. Shamon also said she told Young she would have to wait to call the prosecutor to see if they were going to drop the charges. And finally, Shamon testified that the prosecutor could not drop the charges in one day.
 {¶ 32} The obvious implications that can be drawn from this testimony are that cases, in fact, are not simply dismissed due to a victim's request, and that the prosecutor (or some other entity) has some type of discretion over the disposition of cases. This was consistent with what the prosecutor said, even though the precise procedural details of a dismissal were not established by the testimony. For this reason, we do not think the trial court erred in overruling the defense objection. However, even if the trial court had erred, any error would have been harmless beyond a reasonable doubt, due to the overwhelming evidence of Young's guilt. See, e.g., State v. Moreland, Greene App. No. 2001 CA 85,2003-Ohio-210, ¶ 22.
 {¶ 33} As we mentioned, Young's second point concerning this assignment of error is that his attorney was improperly prevented during closing argument from commenting on inferences arising from the birthday gift Shamon gave Young shortly after the abduction incident. At trial, Shamon testified that Young's birthday was July 18, which was about a week after the abduction. She admitted that she had given Young a sweater for his birthday, and had gone to a hotel with him on his birthday. Shamon's explanation for this was that she still loved and cared for Young. During closing argument, the court sustained an objection to the following remarks:
 {¶ 34} "What happened on July 4th? She went to Casey. And this is how important that Casey was to her at this period of time. July 18th, Casey's birthday, after the alleged event, somebody abducted my children wouldn't be buying them —"
 {¶ 35} What defense counsel clearly meant by this comment is that he would not buy someone a sweater for his or her birthday if that person had abducted his children. However, this comment was either irrelevant or was an improper personal opinion about credibility. See, e.g., State v.Hall (1995), 106 Ohio App.3d 183, 191; State v. Ross (1999),135 Ohio App.3d 262, 273; and State v. Williams, 79 Ohio St.3d 1, 12,1997-Ohio-407 (indicating that counsel may not express personal opinions about credibility of witnesses). In either instance, the trial court was correct to sustain the objection.
 {¶ 36} Nonetheless, immediately after the objection was sustained, defense counsel went on to say:
 {¶ 37} "Despite what she testified occurred, she bought Casey a sweater for his birthday, or at least gave him a sweater for his birthday. On her birthday, she testified — which was I believe May 21st, she visited him in the jail. 4th of July, major holiday, she spent it with Casey. She's spending all of these events with Casey."
 {¶ 38} Thus, while defense counsel was precluded from proceeding with his initial remarks, he was still able to effectively question the fact that Shamon gave a gift to someone who had abducted her children. As a result, even if the trial court had erred in sustaining the objection, no harm would have been caused. However, as we said, we do not think the trial court committed any error.
 {¶ 39} Accordingly, the second assignment of error is without merit and is overruled.
 III {¶ 40} The final point for discussion is the State's cross-assignment of error, which challenges the trial court's refusal to find that the abductions were sexually oriented offenses. In this regard, the trial court agreed that under R.C. 2950.01, abduction of a victim under the age of eighteen is classified as a sexually-oriented offense. See R.C. 2950.01(D)(2)(b). However, the trial court found that the abduction offenses were not motivated in any way by sexual purpose, or with a purpose to gratify Young's sexual needs, or to allow Young to engage in sexual activity. The court found, in fact, that Young had no intent to harm the children in any way. As a consequence, the court held that no rational relationship existed between the governmental goal of protecting the public from sexually oriented offenders and the facts of this case.
 {¶ 41} In contesting the decision, the State recognizes that we previously ruled on this point in State v. Barksdale, Montgomery App. No. 19294, 2003-Ohio-43, and State v. Reine, Montgomery App. No. 19157,2003-Ohio-50. In both cases, we held that applying the statutory requirement that an individual be classified as a sexually oriented offender, where the offenses were committed without any sexual motivation or purpose, "is unreasonable and arbitrary, and bears no rational relationship to the purposes of the statute." Barksdale, 2003-Ohio-43, ¶ 28; Reine, 2003-Ohio-50, ¶ 28. Consequently, we concluded that such an application of the statute offends the Due Process clauses of both the Ohio and United States constitutions. Id.
 {¶ 42} The State argues that our prior decisions are erroneous and should be reconsidered. We disagree. We thoroughly considered the issues in Barksdale and Reine and see no reason to depart from our opinions in those cases. As a result, the State's cross-assignment of error is without merit and is overruled.
 {¶ 43} Based on the preceding discussion, the Defendant's assignments of error and the State's cross-assignment of error are all overruled. Accordingly, the trial court judgment is affirmed.
FAIN, P.J., and YOUNG, J., concur.