*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0413p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DEMARKUS HODGE,

          *Petitioner-Appellant,*

    *v.*

PAT HURLEY, Warden,

          *Respondent-Appellee.*

No. 03-3166

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-01773—Kathleen McDonald O'Malley, District Judge.

Argued: August 11, 2004

Decided and Filed: October 12, 2005

Before: SILER, MOORE, and COLE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Theresa G. Haire, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Mark Joseph Zemba, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Cleveland, Ohio, for Appellee. **ON BRIEF:** Siobhan R. Clovis, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Mark Joseph Zemba, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Cleveland, Ohio, for Appellee.

    MOORE, J., delivered the opinion of the court, in which COLE, J., joined. SILER, J. (pp. 24-26), delivered a separate dissenting opinion.

---

**OPINION**

---

    KAREN NELSON MOORE, Circuit Judge. This is a child-rape case where the only evidence sufficient to sustain a conviction was a jury determination that the complaining witness was more credible than the defendant. During his egregiously improper closing argument, the prosecutor commented on the credibility of witnesses, misrepresented the facts of the case, made derogatory remarks about the defendant, and generally tried to convince the jury to convict on the basis of bad character, all while defense trial counsel sat idly by.[1] We conclude that the defendant's

---

[1] The prosecutor's entire closing argument is attached as an appendix to this opinion.

trial counsel was constitutionally ineffective in failing to object to this misconduct, and that the state court's determination to the contrary was an unreasonable application of clearly established Supreme Court precedent. Accordingly, we **REVERSE** the decision below and **REMAND** the case to the district court with instructions that a conditional writ of habeas corpus, giving the State of Ohio ninety days to retry Hodge or release him from custody, be **GRANTED**.

## I. BACKGROUND

### A. Factual Background

Petitioner-Appellant Demarkus Hodge ("Hodge") was convicted of rape of a child under thirteen years of age in Ohio state court and sentenced to mandatory life imprisonment. At the time of the events at issue in this case, Hodge was a seventeen-year-old ninth-grade dropout living with his twenty-three or twenty-four-year-old girlfriend, Consuela Fenn ("Fenn"), in Lorain, Ohio. The factual background presented by the State can be summarized as follows:

In the early afternoon on December 22, 1996, Fenn had just begun taking a bath when she heard moaning coming from her daughter's room. Concerned, she jumped out of the bath tub, ran to the bedroom, and found Hodge in the process of sexually penetrating Fenn's three-year-old daughter, Jane Doe[2] ("Jane").[3] The couple fought briefly, and Hodge threatened to kill Fenn and her children if she told anyone what had happened. Fenn, Hodge, and Fenn's three children[4] then went to a birthday party at Fenn's brother's house. While at the party, Fenn did not tell anyone what she had seen. However, Fenn's grandmother, Floncia Lovejoy, thought Jane was acting strangely and decided to take Jane home with her.

When Floncia Lovejoy tried to give Jane a bath early that evening, Jane began crying, and Floncia Lovejoy noticed blood in Jane's underwear and three small cuts in Jane's genital area.[5] Floncia Lovejoy called to Barbara Lovejoy (Floncia's daughter and Fenn's aunt), who was in the downstairs portion of the house at the time, and showed her the blood. Barbara Lovejoy then went back to the party and got Fenn. Either Barbara Lovejoy or Fenn called the police, and an ambulance took Fenn, Jane, and one or more other relatives to Elyria Memorial Hospital. That hospital did not have the right equipment to examine Jane, and the group was sent to another hospital, St. Joseph's.

At St. Joseph's, Jane was examined by Dr. Timothy Omley ("Dr. Omley"), who noted minor injury to her genital area, but apparently did not make any diagnosis as to whether Jane had been sexually assaulted. On January 15, 1997 and February 18, 1997, Jane was examined by Nurse Practitioner Lauren McAliley ("Nurse McAliley"). On February 18, 1997, Jane was also examined by Nurse McAliley's supervisor, Dr. Lolita McDavid ("Dr. McDavid"). Both Nurse McAliley and Dr. McDavid testified at trial as expert witnesses.

---

[2] We use the pseudonym Jane Doe to protect the identity of Fenn's minor child.

[3] Specifically, Fenn testified that Hodge "had penetrated" Jane, and that "his penis was inside of her." Joint Appendix ("J.A.") at 340-41 (Test. Consuela Fenn). On cross-examination, she demonstrated the distance that she believed Hodge's penis had penetrated, which the trial judge read in the record as "about an inch, inch and a half, somewhere in that range. Two inches maximum." J.A. at 364 (Test. Consuela Fenn).

[4] Fenn testified that Hodge was not the father of any of her children.

[5] The underwear was never introduced in evidence, as Floncia Lovejoy immediately threw it into the bathtub and apparently washed off all of the blood.

Fenn was initially interviewed by law enforcement officers while Jane, Fenn, and her relatives were at Elyria Memorial Hospital, but Fenn did not tell the officers anything about witnessing the incident. Later that same evening, or possibly early the next morning, Fenn spoke with a Detective Miller and again failed to mention having seen the actual act.[6] However, on December 24, 1996, Fenn told her stepmother, Alice Fenn, that she had seen Hodge penetrate Jane. Alice Fenn relayed this information to other family members, and Barbara Lovejoy began threatening Fenn that she would go to jail herself if she did not implicate Hodge.[7]

Fenn agreed to admit that she witnessed the incident, and Barbara Lovejoy brought Fenn to talk to Detective Miller. After her discussion with the detective, Fenn was put in jail and charged with child endangering and failure to report a crime. Some months later, the charges against Fenn were dismissed, but not until after Fenn testified against Hodge before a grand jury. The resulting indictment of Hodge appears to be dated February 19, 1997.

Hodge presented a different version of these events. According to his account, Hodge did nothing more than get Jane dressed to go to a birthday party on the afternoon in question. Hodge further asserted that during the several months he lived at Fenn's house, he would watch Fenn's children eight hours a day, five days a week, while Fenn was at work. Hodge spent his free time alone with Fenn's children, and would have had many opportunities to rape Jane when Fenn was not at home, were he inclined to take such an action. (There was no accusation or evidence that Hodge had ever been involved in other sex acts with children, or that he had ever previously done anything sexually improper with any of Fenn's children). Hodge suggested that Fenn's accusations could be motivated by Fenn's family's intense dislike of him.

At trial, Nurse McAliley testified that, after performing a genital examination on Jane, she found no physical evidence of sexual abuse.[8] Nonetheless, Nurse McAliley made an initial diagnosis "that sexual abuse was possible." J.A. at 420 (McAliley Test.). As Nurse McAliley later explained, she would make a finding that sexual abuse was "possible" except in the case of a "newborn that's just come out of its mother's womb." J.A. at 431 (McAliley Test.). However, Nurse McAliley later elevated her diagnosis to "probable" sexual abuse after reviewing police reports indicating that Fenn had claimed that she had witnessed Hodge raping Jane. J.A. at 419-20, 424, 433 (McAliley Test.). This elevation in Nurse McAliley's diagnosis was substantial, because according to Nurse McAliley, "probable" sexual abuse "means that the history, the physical, the laboratory, the behavioral summary, are *very compelling*." J.A. at 433 (McAliley Test.) (emphasis added).

---

[6] Battered Women's Syndrome was discussed extensively during the prosecution's closing argument as an explanation for Fenn's earlier failures to state that she had seen Hodge rape Jane. However, no expert testimony or other evidence on Battered Women's Syndrome was presented to the jury.

[7] Barbara Lovejoy testified that Fenn admitted to witnessing the alleged act:
after I [i.e., Barbara Lovejoy] got done talking to her and threatening her . . . . Yes, she told, because I was telling her she was going to go to jail, she was going to be the one to take the blame that someone else did if she didn't open her [expletive] mouth.
J.A. at 316 (Test. Barbara Lovejoy).

[8] Specifically, Nurse McAliley testified:
Q.    So are you telling the Court and jury that by the time [Jane] got to you, there was absolutely no physical sign[] of her being abused on December 23rd?
A.    She had some nonspecific findings that we could not tie to sexual abuse, so the exam was essentially normal. Yes, that is what I am telling you.
J.A. at 417-18 (McAliley Test.).

Dr. McDavid testified that the physical examination of Jane was "not diagnostic, meaning that you could not say that something had happened or something had not happened." J.A. at 466-67 (McDavid Test.). Similarly, reported changes in Jane's behavior were "suggestive" and "concerning" but "non-specific." J.A. at 465-66 (McDavid Test.). On further questioning, Dr. McDavid testified, in essence, that Jane's behavioral changes were non-specific because any major behavioral change can be suggestive of sexual abuse. *Id.* (McDavid Test.). However, despite these nonconclusive physical and behavioral findings, Dr. McDavid's review of the police reports — primarily those portions of the police reports discussing Fenn's allegation that she witnessed Jane being raped — allowed her to conclude "within a reasonable degree of medical certainty" that Jane "was raped." J.A. at 449-50 (McDavid Test.); J.A. at 467-468 (McDavid Test); *see also* J.A. at 456 ("[W]e read the police reports and we accept them to be true.").

Hodge's expert, Dr. Daryl Steiner, did not have the opportunity physically to examine Jane. Like Nurse McAliley and Dr. McDavid, Steiner testified at trial that based on his review of the relevant medical records, there was no physical evidence that could confirm that Jane had been sexually abused. However, rather than relying on the police reports and bill of particulars (and the alleged eyewitness account therein) necessary to Nurse McAliley's and Dr. McDavid's diagnoses,[9] Steiner testified that the conflicting stories Fenn told at different times required him to disregard her version of the events entirely. Without an eyewitness account of rape on which he was willing to rely, Steiner concluded that Jane's minor genital injury was "a straddle injury," J.A. at 544, caused by falling and straddling a hard object, rather than a sign of sexual assault.

## B. Procedural Background

Hodge was convicted by an Ohio jury on February 6, 1998. That same day, the state trial judge sentenced Hodge to a mandatory term of life imprisonment,[10] and found that Hodge qualified as a sexual predator under Ohio law. Hodge's initial appeal was dismissed on technical grounds, but after some difficulties Hodge was allowed to reopen the appeal. Nevertheless, the Ohio Court of Appeals rejected all of Hodge's claims. The Supreme Court of Ohio denied leave to appeal. Hodge filed a petition in federal court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting four grounds of ineffective assistance of counsel.[11] The district court denied the petition in its entirety, and we granted a certificate of appealability on all issues raised in the petition.[12]

## II. ANALYSIS

## A. Jurisdiction

As Hodge asserted that he was being held by the State of Ohio in violation of the Sixth Amendment of the United States Constitution, the district court had jurisdiction over his habeas

---

[9]The prosecutor conducted an extensive cross-examination on this issue, suggesting that Dr. Steiner's failure to accept as true the allegation of rape contained in the bill of particulars was not "intellectually honest." J.A. at 577 (Steiner Test.); *see also* J.A. at 574-77 (Steiner Test.).

[10]According to the sentencing judge, Hodge will be eligible for "parole consideration after serving ten full years." J.A. at 772 (Sentencing Tr.).

[11]Hodge asserts that his trial counsel was ineffective in: (1) "fail[ing] to object to egregious prosecutorial misconduct;" (2) "fail[ing] to object to improper expert testimony and reports;" (3) fail[ing] to object to incomplete jury instructions;" and (4) "fail(ing) to adequately inform his expert medical witness about the facts of the case." Hodge Br. at 2.

[12]The State does not maintain that any of the claims currently before this court were procedurally defaulted.

corpus petition pursuant to 28 U.S.C. § 2254.  We have appellate jurisdiction over all issues on which the certificate of appealability was granted.  28 U.S.C. §§ 1291, 2253.

## B.  Standard of Review

When a district court denies a petition for habeas relief under § 2254, we review that court's legal conclusions de novo.  *Palazzolo v. Gorcyca*, 244 F.3d 512, 515 (6th Cir.), *cert. denied*, 534 U.S. 828 (2001).  As Hodge's habeas petition was filed on July 20, 2001, it falls within the scope of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 US. 320, 326-27 (1997).  Under this statute, we may not grant habeas corpus relief on behalf of a person in state custody with respect to any claim that a state court adjudicated on the merits unless the state court decision was "contrary to" clearly established Supreme Court precedent, "an unreasonable application of" clearly established Supreme Court precedent, or "an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d).[13]

## C.  Ineffective Assistance of Trial Counsel

Hodge argues that the state court decision was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), and we agree.  Hodge's claim of ineffective assistance of trial counsel simply requires that he demonstrate two things:  deficient performance by trial counsel, and prejudice from trial counsel's deficient performance.  *Id.* at 687.[14]  To satisfy the performance prong, Hodge must demonstrate that the representation he received "fell below an objective standard of reasonableness."  *Id.* at 688.[15]  Although an attorney is "strongly presumed to have rendered adequate assistance," the performance prong is satisfied if the representation at issue falls "outside the wide range of professionally competent assistance."  *Id.* at 690.  We believe that trial counsel's failure to object to *any* of the numerous improper statements in the prosecution's closing argument is well outside this range.[16]

---

[13]In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court explained the effect of § 2254(d)(1):
> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13.  "[A]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law."  *Id.* at 412.

[14]The *Strickland* court defined the test as follows:
> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[15]This objective reasonableness must be determined on the basis of "the facts of the particular case, viewed as of the time of counsel's conduct."  *Strickland*, 466 U.S. at 690.

[16]As we conclude that Hodge is entitled to relief on his claim that his trial counsel was constitutionally ineffective in failing to object to the prosecutor's egregious misconduct, we need not address Hodge's other ineffective-assistance claims.

To satisfy the prejudice prong, Hodge had to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.[17] As Hodge challenged the conviction itself, this required him to demonstrate "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.[18] In a trial such as this one, where the result depended primarily on the jury's belief as to whether Hodge or Fenn was more credible, we believe there is a reasonable probability that the result of the proceeding would have been different. The only issue is then whether the state court's contrary conclusion was unreasonable. As set forth in more detail below, we conclude that it was.

### 1. The Misconduct in Question

As the Supreme Court has emphasized, the tremendous power a prosecutor may wield is accompanied by a special responsibility to exercise that power fairly:

> [A prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

*Berger v. United States*, 295 U.S. 78, 88 (1935); *see also State v. Lott*, 555 N.E.2d 293, 300 (Ohio) (quoting several of the above sentences from *Berger*, and stating that "[t]hese comments apply with equal force to Ohio prosecuting attorneys."), *cert. denied*, 498 U.S. 1017 (1990). Unfortunately, when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. A failure to make such an objection can have devastating consequences for an individual defendant. Accordingly, we have previously held that a failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel. *See, e.g., Gravley v. Mills*, 87 F.3d 779, 785-86 (6th Cir. 1996); *Rachel v. Bordenkircher*, 590 F.2d 200, 204 (6th Cir. 1978).[19]

---

[17]A court applying *Strickland*'s prejudice prong "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. Accordingly, the prejudice determination is necessarily affected by the quantity and quality of other evidence against the defendant. In particular, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

[18]This is a lesser standard than preponderance of the evidence, and accordingly a defendant "need *not* show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693 (emphasis added).

[19]We have previously noted the particular dangers posed by prosecutorial misconduct in sexual abuse cases:
Cases involving sexual abuse exert an almost irresistible pressure on the emotions of the bench and bar alike. Because such cases typically turn on the relative credibilities of the defendant and the

### a. Misrepresentation of Facts in Evidence and Comment on Witness Credibility

### i.  Comment on Witness Credibility

Throughout closing argument, the prosecutor repeatedly commented on the credibility of witnesses, including Hodge, Fenn, Fenn's family, Dr. Steiner, Dr. Omley, Dr. Jackson, and Nurse McAliley. Two of these statements were particularly egregious, as they constituted comment on the veracity of the two key witnesses in the case — the defendant (Hodge) and the complaining witness (Fenn). First, the prosecutor asserted that Hodge "is lying to extricate himself from what he's done." J.A. at 189 (final closing argument by prosecution). The prosecutor then compounded the misconduct by claiming that "Consuela Fenn is absolutely believable, her family is absolutely believable." J.A. at 189 (final closing argument by prosecution).

Without citing, quoting, or discussing any of these statements, the state court found:

> The comments spoken by the prosecuting attorney here were in the context of contrasting the defense and prosecution witnesses. The prosecutor did not claim to have personal knowledge of any witness's truthfulness. We find the prosecutor's comments on the credibility of witnesses were within the bounds of [*State v. Price*, 398 N.E.2d 772 (Ohio 1979), *cert. denied*, 446 U.S. 943 (1980)].

*State v. Hodge*, 2000 WL 1533917, at \*7 (Ohio Ct. App. Oct. 18, 2000) (unpublished) ("*Hodge I*"), *leave to appeal denied by* 743 N.E.2d 399 (Ohio 2001). The state court did not explicitly address the effect of this finding on Hodge's ineffective-assistance claim. However, it appears that the state court intended to hold that, as it found that no misconduct occurred, trial counsel's failure to object did not satisfy the performance prong of the *Strickland* ineffective-assistance test.

We disagree with the state court's conclusion that no misconduct occurred. It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying. *United States v. Young*, 470 U.S. 1, 17-19 (1985); *Berger*, 295 U.S. at 86-88 (citing prosecutor's statements suggesting that he had personal knowledge that a witness was not being truthful as one example of egregious prosecutorial misconduct); *see also Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005) ("To be certain, prosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence. But, they can not put forth their opinions as to credibility of a witness, guilt of a defendant, or appropriateness of capital punishment."); *United States v. Carroll*, 26 F.3d 1380, 1389 (6th Cir. 1994) ("We cannot overstate the extent to which we disapprove of this sort of improper vouching by prosecutors."); *State v. Smith*, 470 N.E.2d 883, 885 (Ohio 1984) ("It is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused."). The prosecutor did both in this case, explicitly stating that Fenn was "absolutely believable," but that Hodge was "lying." J.A. at 189 (final closing argument by prosecution).

As the Supreme Court explained in *Young*, there are two separate harms that arise from such misconduct. First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Young*, 470 U.S. at 18. Second, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the

---

prosecuting witness, however, a strict adherence to the rules of evidence and appropriate prosecutorial conduct is required to ensure a fair trial.
*Martin v. Parker*, 11 F.3d 613, 616-17 (6th Cir. 1993).

evidence." *Id.* at 18-19. Both concerns are implicated in this case. The prosecutor's numerous statements on witness credibility — often unsupported by any rational justification other than an assumption that Hodge was guilty — cannot avoid suggesting to the jury that the prosecutor knows something they do not.[20] Moreover, because these statements by the prosecutor were not coupled with a more detailed analysis of the evidence actually adduced at trial, they convey an impression to the jury that they should simply trust the State's judgment that Fenn was a credible witness and that the defendant's witnesses were non-credible, if not perjurious.[21] This misconduct is especially prejudicial in this case given the extent to which the jury's determination as to Hodge's guilt or innocence hinged almost entirely on the credibility of Hodge and Fenn.[22]

We note specifically that Hodge is not taking these statements out of context. In fact, the prosecutor attempted to bolster Fenn's credibility both immediately before and immediately after his attack on Hodge's credibility. The relevant passage — near the end of the prosecutor's rebuttal argument, when it is most likely to be remembered by the jury — begins with the prosecutor's explanation of why Fenn did not immediately accuse Hodge of raping Jane, despite having allegedly caught Hodge in the act:

> Albeit, logically, she could have told and her family would have beaten him up right on the spot probably, if she would have told. But she didn't. That is a battered woman, or she would be out. No woman would ever be stuck in a battered relationship if they could see themselves logically.
> She had waited 40 hours, *she told the truth*, and what she has to say is supported by medical evidence and all the surrounding family.

---

[20] We have previously indicated that it is not necessary for the prosecutor actually to use the words "I believe," or any similar phrase, for a statement to constitute improper comment on the credibility of witnesses. *See, e.g.*, *United States v. Bess*, 593 F.3d 749, 757 n.10 (6th Cir. 1979) (quoting with approval *United States v. Morris*, 568 F.2d 396, 402 (5th Cir. 1978) (noting that an attorney "may not state, 'The prosecution's witnesses are telling the truth,' or 'I believe the prosecution's witnesses are telling the truth'")). We have also noted that the even the use of the words "I want to suggest" would not be sufficient to prevent a statement from constituting improper comment on witness credibility when that statement is coupled with a statement that the witness in question was "is basically telling the truth . . . because she had no reason to lie." *United States v. Krebs*, 788 F.2d 1166, 1176-77 (6th Cir. 1986); *see also United States v. Carroll*, 26 F.3d 1380, 1387, 1389 (6th Cir. 1994) (discussing *Krebs*).

[21] The pattern of attempting to persuade the jury to rely on the prosecutor's assessment of the evidence was not limited to the improper comment on witness credibility. The prosecutor's second definition of "reasonable doubt" — delivered in rebuttal, with no opportunity for counter-argument by defense counsel — ties in with this second concern:
> Take an operation. Say you go to the doctor — and this may have happened to someone in your family — and you're feeling pretty good but you go for a checkup, and the doctor says, "You have a tumor. We have to get it out," or, "You're going to die," but you don't even feel bad. You go to a second doctor to get an opinion, he says the same thing. You know the risks of an operation. You feel great, you have not seen this thing but you're going to have your body cut open and have this thing yanked out. Risk, anesthesia, possible infection; not hopeful. You're full of doubt as to whether that thing's even in there, but you go ahead.
J.A. at 186 (final closing argument by prosecution). As an initial matter, we have grave doubts about the propriety of this example — it seems to suggest a preponderance-of-the-evidence standard, rather than the beyond-a-reasonable-doubt standard required in a criminal case. Hodge does not challenge the propriety of this definition, and accordingly we do not decide it at this time. More important for present purposes, however, it strongly suggests to the jury that beyond-a-reasonable-doubt means trusting representations made by figures in authority. Such an example, without a specific curative instruction, magnifies our concern that the jury would give improper weight to prosecutorial comments on witness credibility.

[22] This, in particular, distinguishes the present case from *United States v. Young*, 470 U.S. 1 (1985). Reviewing for plain error, the Court in *Young* found that the prosecutor's comments were erroneous but did not warrant reversal, in light of defense counsel's own improper behavior and the "overwhelming evidence" of the defendant's guilt. *Id.* at 19.

He has offered you nothing. He has tried to portrary himself as a law-abiding, respectful, mild-mannered person. He is anything but that. He is uncontrollable; he's not living with the family who he's supposed to be; he's been kicked out of school for fighting; he has the guts to fight with police officers. He is not what he portrays himself to be, and that is because *he is lying to extricate himself from what he's done*.
Consuela Fenn is absolutely believable, her family is absolutely believable.

J.A at 188-89 (final closing argument by prosecution) (emphases added). Such juxtaposition of the prosecutor's comments with regard to Hodge and Fenn can only exacerbate the prejudicial effect of each statement.

### ii. Comment on Witness Credibility Combined with Misrepresentation of the Evidence

The prosecutor repeatedly — and incorrectly — informed the jury that, in order to acquit Hodge, they would have to conclude affirmatively that Fenn's family members were intentionally lying on the witness stand. This was a blatant misrepresentation. For example, the prosecutor stated early in his initial closing argument:

But there are things that support what Consuela has to say, that, you know, document that she is *telling the truth*, and *unless you decide that all of the women from her family, including her grand — great grandmother and great aunt are absolute liars*, you know she is *telling you the truth*, and she is supported in what she said 40 hours later.

J.A. at 153-54 (closing argument by prosecution) (emphases added). The prosecutor returned to this point near the end of his initial closing argument:

To find him not guilty, you have to find Consuela Fenn and her whole family to be *nothing but liars*, and to believe in what you heard from the Defense here. What you have to the contrary of that is that of a doctor who — *three people have unethically testified today, and I think you will know that's the case*. Him denying it, and a family that barely knows him comes in here saying he's not that kind of guy, even though he got kicked out of school for fighting, and he was a horrendous prisoner.

J.A. at 159 (closing argument by prosecution) (emphases added). As Fenn had told each of her family members that she saw Hodge rape Jane, these witnesses' belief that a rape had occurred was based almost entirely on their belief that Fenn was telling them the truth when she told them she had witnessed the act. Although Floncia Lovejoy and Barbara Lovejoy found blood in Jane's underwear and observed what they allege was abnormal behavior by Jane on the night in question, the jury was not required to conclude that either Floncia Lovejoy's or Barbara Lovejoy's testimony about these observations was untruthful in order to acquit Hodge. Instead, the jury simply needed to determine that the testimony about blood in Jane's underwear was not sufficient to establish Hodge's guilt. Such misrepresentations are themselves unacceptable prosecutorial conduct. *See Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986) (noting that the court did not find it appropriate to overturn Darden's conviction in a habeas proceeding because, despite the prosecutor's other severe misconduct, "the prosecutor's argument *did not manipulate or misstate the evidence*, nor did it implicate other specific rights of the accused") (emphasis added).

The prosecutor's comments also extended to the credibility of other witnesses in the case. Most troubling are his statements about Dr. Omley, which also completely misrepresent the doctor's testimony, while at the same time accusing defense counsel of "twisting . . . the facts":[23]

> He also says — and this is a great twisting of the facts, too. I mean, what's going on here? — Dr. Omley said there were no fingerprints. He [apparently referring at this point to defense counsel, who had just made his closing argument] told you he [apparently referring at this point to Dr. Omley] found there was handprints or fingerprints. *That's a lie.* You look at his report. *Dr. Omley said there was handprints*, but I asked him if he found bruises that would be consistent with the tension of fingers, and *he said yeah, and he notes bruises throughout the chest*, which supports what the family is saying, which destroys the straddle injury theory. And if you read Dr. Steiner's report, you'll find he has *wrongfully dealt* with these issues as well.

J.A. at 184-85 (final closing argument by prosecution) (emphases added). In his testimony, however, Dr. Omley — the physician who examined Jane in the emergency room at St. Joseph's — neither stated that he saw a handprint on Jane nor did he state that he saw bruises "consistent with the tension of fingers." J.A. at 185 (final closing argument by prosecution). Instead, he testified that the fact the he saw no handprint would not preclude the possibility that Jane had been grabbed by someone's fingertips — a statement very different than an affirmative finding of bruises "consistent with the tension of fingers." The relevant portion of Dr. Omley's testimony begins during defense counsel's cross-examination, when Dr. Omley is asked to read from the record that he (Dr. Omley) prepared after examining Jane on December 23, 1996:

> A.   "Scratches noted on the anterior" — and that's the front — "chest and sides of abdomen of varied shape, *no handprint*"
> Q.   Let me stop you there. *What does no hand print mean?*
> A.   When we see lacerations or bruising to children, anybody, we look for hand imprints on people, because if it's inflicted severely enough, you can sometimes see a handprint bruise on people.
> Q.   So that would be something you would look for as perhaps indicative of an abusive thing as opposed to a natural type of injury?
> A.   That's correct.
> Q.   *And a handprint, if done hard enough, could actually show up where you could see the outline of fingers or thumbs, is that accurate?*
> A.   *That's accurate, sir.*
> Q.   *You found none of that on this particular victim?*
> A.   *That's correct.*

J.A. at 395 (Omley Test.). The prosecutor returned to the handprint issue on redirect examination:

---

[23]Defense counsel had just stated the following in his closing argument:
The first doctor, Dr. Omley, who examined [Jane] at the emergency room that evening, found a one-half inch laceration and said *no hand or finger marks*. I would ask you, please, carefully look through these medical records because you have a number of them that will go with you to the jury room, you won't have to recall this testimony.
J.A. at 172 (closing argument by defense) (emphasis added).

> Q.    Thank you.
>        Now, Mr. Nagy also pointed out that you *did not see a bruise that was consistent with being identified as a handprint, is that correct?*
> A.    *That's correct.*
> Q.    Does that mean, though, that what you saw rules out someone grabbing the child forcefully with fingertips?
> A.    We did not — I mean, I did not record any handprints.
> Q.    But that's a whole hand?
> A.    That's a whole hand.  Whether or not at some point somebody physically put ten little spots on the child, I can't say.
> Q.    Okay.  *So your finding of no handprint does not preclude or would not be the bare basis for an argument saying she was not grabbed by fingertips?*
> A.    *That's correct.*

J.A. at 407 (Omley Test.).  This testimony shows that the prosecutor's statement that "Dr. Omley said there was handprints, but I asked him if he found bruises that would be consistent with the tension of fingers, and he said yeah, and he notes bruises throughout the chest," J.A. at 185 (final closing argument by prosecution), is clearly incorrect.  More disturbingly, the prosecutor's specific questioning of Dr. Omley on this point suggests that the prosecutor knew that his own later statements during closing arguments were, at the very least, a set of serious misrepresentations.  Such statements would be inexcusable even if the prosecution had not just called defense counsel's (accurate) description of Dr. Omley's testimony "a lie."  J.A. at 185 (final closing argument by prosecution); *see also* J.A. at 172 (closing argument by defense).  Together, the statements are indefensible.

Also disturbing are the prosecutor's statements about Dr. Steiner's credibility.  These generally assume the truth of any statement made by the prosecution's expert witnesses, and accuse Dr. Steiner of acting wrongfully or unethically, or even perjuring himself, for any statements he made contradicting the testimony of the prosecution's expert witnesses.  For example, in his initial closing argument, the prosecutor devoted substantial time to criticizing Dr. Steiner's (entirely proper) statement that he was not in a position to testify as to Fenn's credibility:

> Now, even Dr. Steiner, finally, after hours of cross examination, admitted that if you believe Consuela's eyewitness account then you should believe Dr. McDavid and you should rule this a rape, and find this as a rape.  He concedes that.
>        To get around that issue, he severely discounts Consuela's history.  He tells you he's not in a position to judge, he wouldn't do that, and he tries to distance himself from the fact that he *wrongfully* discounts her story.  But we all know from his testimony and his report he is judging her; he is ruling out her credibility even though out of the other side of his mouth he says he is not.  You read that report.  He sat up there, I don't know how many times, and claims, based on what Dr. McDavid said, there were five statements, and because there were five statements, you should not believe the sixth.  That's what he's saying.  That's just not credible.  He has conceded he did not have the information you have, he can't make that judgment as good as you, and *he is wrong, and you know that*.  He has not heard everything you have heard.  He, *I think wrongfully*, has told you he's never even heard of a battered woman, he's not in a position to evaluate that, that everyone that comes into his emergency room gives an accurate story, there is never a mistake in the date.  This is how he has manipulated the data to appear that he is giving a medical opinion that should not be permissible in court and isn't reliable.  He is pretending to act within the confines of his field of practice when he gives this opinion, but what he does is, he chooses to discount whether Consuela says there are (sic), therefore there is no history, therefore it is improper to conclude child abuse.  Well, if there were no

history, you could not rule out child abuse. You cannot find probably child abuse, but you couldn't rule it out. But look at what he's doing and saying; both he and in his report say it's a straddle injury. But he didn't have a history. Now he doesn't need a history, which is required by his profession to obtain a diagnosis of an accidental straddle injury. But he discounts everybody else's use of a history to find sex abuse.

> *Now, how can he do that ethically? He cannot.* And that's what Dr. Jackson just said. And, in the same v[e]in, he came to this courtroom and, despite nurse McAliley saying she has seen — a videotape of a young girl being penetrated, I think even 1000 times — a normal picture of the hymen, he comes in and tells you there can't be an inch and a half penetration of a prepubescent female vaginally without hymenal damage. *That's a lie*. Dr. Steiner says that is unethical, that is not the knowledge that they have today in this field. But yet he is telling you that. *So somebody here has perjured themselves; it's either Nurse McAliley, Dr. McDavid and Dr. Jackson, or it's Dr. Steiner*.

J.A. at 156-158 (closing argument by prosecution) (emphases added). It was entirely improper for the prosecutor imply that any disagreement between the expert witnesses (who, as professionals, could very well have legitimate professional disagreements) meant that one of those witnesses must be perjuring him or herself.

### iii. Additional Misrepresentation of the Evidence

In his rebuttal argument, the prosecutor also made another clear misrepresentation in his effort to discredit defense counsel's closing argument:

> Mr. Nagy also said that Consuela was being investigated by Children Services. I didn't hear that in this trial. I don't know where that came from. I don't know why he feels he has to unfairly damage her reputation now, but apparently he does.

J.A. at 184 (final closing argument by prosecution). However, Fenn testified that she had in fact been investigated by Children Services:

> Q. Prior to this particular incident, ma'am, had you had — had you been investigated by Children Services about your conduct with your children?
> A. Right.
> Q. When was that, approximately?
> A. I don't know exactly, but I know it was after it had happened.
> Q. After this happened?
> A. Right. I don't know exactly —

J.A. at 363 (Test. Consuela Fenn). The prosecutor's statement to the contrary was plainly inconsistent with the testimony presented at trial.

### b. Derogatory Remarks and Arguments Based on Bad Character

Hodge also asserts that his attorney erred in failing to object to the several derogatory comments made by the prosecution during closing argument. At least three of these are clearly improper:

> [Hodge] certainly could pass for a 23-year-old. I wonder how many he's had to drink, in this period of emancipation, as an adult.

Unfortunately, [Hodge's] idea of supporting himself is getting my share of supplemental income or [a] share of my family's Social Security Supplemental [I]ncome.

[H]ow would you like to put yourself in the place of someone that might run into [Hodge] at night?

*See* J.A. at 160, 180-81 (closing argument by prosecution). Again without citing, quoting, or even discussing these statements, the state court made a finding that no ineffective assistance occurred, this time apparently relying on the prejudice prong of the *Strickland* inquiry.[24]

These statements are highly improper. First, the prosecutor's insinuation that Hodge regularly drank alcohol illegally by passing himself off as being over twenty-one years of age — a claim that in no way relates to the crime charged — is improper both as an inappropriate emphasis on Hodge's alleged "bad character," *Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000), and as an argument based on facts not in evidence. *Berger*, 295 U.S. at 86-89; *Abela v. Martin*, 380 F.3d 915, 929 (6th Cir. 2004); *Smith*, 470 N.E.2d at 885. Second, the prosecutor's suggestion that Hodge's "idea of supporting himself" was to get part of the prosecutor's or the prosecutor's family's Social Security income is similarly flawed. Third, the prosecutor's suggestion that the jury try to "put [itself] in the place of someone that might run into [Hodge] at night" is a version of the impermissible "golden rule argument." *See, e.g.*, *City of Cleveland v. Egeland*, 497 N.E.2d 1383,1389 (Ohio Ct. App. 1986) ("The prosecutor cannot properly threaten the jury that an acquittal would jeopardize them personally. Such arguments ask the jurors to shed their objectivity and to assume the role of interested parties.") (citations omitted); *cf. Boop v. Baltimore & Ohio R.R. Co.*, 193 N.E.2d 714, 716 (Ohio Ct. App. 1963) ("This type of argument, where the jurors are asked to put themselves in the place of plaintiff, is commonly known as the 'Golden Rule Argument' and, upon objection being made, is normally considered objectionable and incompetent for the reason that it constitutes an appeal to the jury to abandon their position of impartiality and to exercise their discretion in the guise of an interested party.").

The dissent agrees with our conclusion that these statements were improper, but disagrees with our ultimate conclusion that the state court applied *Strickland* unreasonably. We emphasize that the each instance of prosecutorial misconduct — and each failure to object thereto — must not be considered in isolation, but in the context of the prosecution's entire opening statement and closing argument, which repeatedly suggested that the jury could consider, as evidence of guilt, whether Hodge was the type of person who would attempt to rape a young child. For example, the prosecutor concluded his opening statement with a promise to prove not that Hodge committed this particular act, but that Hodge was "one of those people" who needed to have sex with children. *See* J.A. at 148 (opening statement by prosecution). This formulation does not appear to have been accidental, as the prosecutor repeated it at the conclusion of the initial portion of his closing argument. *See* J.A. at 160 (closing argument by prosecution). The conclusion of the prosecution's rebuttal closing argument continued this theme, but in a more prejudicial and even more inaccurate way:

It's just like the doctor says, "All of the pieces to the puzzle fit." *By themselves none of them mean anything, the medical findings by themselves mean nothing, the*

---

[24]Specifically, the state court held:
We have reviewed the prosecutor's closing arguments and find that even absent any possible prosecutorial misconduct, the jury would have found Hodge guilty. Further, the trial court did instruct the jury that counsel's arguments were not evidence. Under the circumstances, we simply cannot conclude that the prosecutor's comments rose to the level of prejudicial error.
*Hodge I*, 2000 WL 1533917, at *8.

*eyewitness account means nothing, the battering by itself means nothing. But if you lump all of these things together and — his past behavior and conduct at the jail mean nothing, but if you put it all together, it proves the State's case beyond a reasonable doubt.* And if you piecemeal it like Dr. Steiner would like you to do, or discount parts of it, the State can't make its case. But if you logically, as your duty requires, consider everything and dig in and look as you promised, you're going to know he's guilty.

Because if he was mild-mannered, he wouldn't have that problem at the jail. If he was mild-mannered, he wouldn't have been kicked out of school. If he wasn't domineering, she would have left him. If he didn't own her, he would not have tried something as ridiculous as this at home while she was in the bathtub. But he is so used to controlling the people around him for his whole life, he can do anything he wants.

So he thought. Until today.

J.A. at 189-90 (final closing argument by prosecution) (emphasis added). This statement incorrectly suggested the jury should consider several factors — the medical findings, Fenn's eyewitness account (and Hodge's testimony to the contrary), the allegations of domestic violence, Hodge's disciplinary record at the jail, and Hodge's "past behavior" more generally — as each insufficient individually to justify a guilty verdict, but collectively sufficient to require one. In other words, even if the jury did not believe, beyond a reasonable doubt, Fenn's statement that she saw the rape, the prosecution argued that Hodge's bad character should tip the scale.

This fundamentally misstates the nature of the finding the jury had to make. The jury had to make only one real decision: whether Fenn was being truthful (and accurate) when she stated that she saw Hodge penetrate Jane. As the medical evidence (excluding that obtained from accepting allegations in the police reports and the bill of particulars as true) was not sufficient to support a finding that sexual contact had occurred, all other testimony presented in the case went only to support or rebut the testimony of Fenn and Hodge. To suggest that "the eyewitness account mean[s] nothing," J.A. at 189 (closing argument by prosecution), but can somehow be converted to proof beyond a reasonable doubt by "lump[ing] it together" with nonspecific medical findings, abusive conduct, past behavior (*none* of which even remotely suggested sexual misconduct or pedophiliac tendencies), and jail misconduct severely misrepresents the type of factual determination the jury is required to make. Taken as a whole, the statement improperly suggested that the jury could consider Hodge's bad character as a thumb on the scale in favor of a finding of guilt.

## 2. Failure to Object

### a. Performance Prong

We conclude that the trial counsel's failure to object to any aspect of the prosecutor's egregiously improper closing argument was objectively unreasonable. *See Strickland*, 466 U.S. at 687-88. Although we must be "highly deferential" when scrutinizing an attorney's performance, *id*. at 689, an action is not objectively reasonable unless it "might be considered sound trial strategy." *Id*. (internal quotations omitted). Here, our inquiry is relatively straightforward, because we do not believe this failure meets the "might be considered sound trial strategy" test.

Decisions not to object to *inadmissible evidence* already heard by the jury can in many cases be classified as part of a deliberate strategy to avoid calling the jury's attention to that evidence. Nonetheless, such concerns are not themselves sufficient to preclude a conclusion of deficient performance, as the court must still consider whether the decision not to object was objectively reasonable. *See Strickland*, 466 U.S. at 688. By contrast, a failure to object to comments on witness credibility or derogatory statements by the prosecutor is much less susceptible to the argument that

it should be considered reasonable trial strategy. *Cf. Washington*, 228 F.3d at 706 ("[A]ccepting as a proper trial strategy a lawyer's doubts over the effectiveness of objections and curative instructions would preclude ineffectiveness claims in every case such as this, no matter how outrageous the prosecutorial misconduct might be.").[25]

To review, the prosecutor accused the Hodge of "lying"; stated that the complaining witness was "absolutely believable"; accused Dr. Steiner of testifying "wrongfully" and "unethically," and telling "a lie"; stated that defense counsel was telling "a lie"; severely misrepresented the testimony of Dr. Omley, the examining physician; stated (incorrectly) that a finding in favor of Hodge required a finding that Fenn's great-grandmother and great-aunt were "absolute liars"; suggested (without any evidence) that Hodge was a frequent underage drinker; insinuated (without any evidence) that Hodge wanted to get part of the prosecutor's family's Social Security checks; suggested that Hodge was the type of person the jury should fear running into at night; and generally argued that the jury should convict Hodge on the basis of his bad character.

With the exception of certain of the bad-character arguments, these statements are harmful to Hodge's case precisely because they are false, unsupported, or misleading, rather than because they are true but inadmissible. As to the bad-character arguments, they were sufficiently egregious to warrant, at a minimum, an objection at the bench following the conclusion of the prosecution's rebuttal argument. We are unable to articulate a sound professional reason why defense counsel did not object to this pattern of repeated misconduct, and accordingly we must conclude that counsel's failure to object was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Accordingly, the performance prong of the *Strickland* ineffectiveness test is satisfied. We must now determine whether Hodge was prejudiced by his counsel's objectively unreasonable actions.

### b. Prejudice Prong

We conclude that Hodge was prejudiced by his counsel's myriad failures to object to the prosecutor's misconduct. The lack of physical evidence confirming sexual activity meant that this was necessarily a close case at the trial level. The result depended primarily on the jury's determination of whether Hodge — who took the stand in his own defense — was more or less credible than his ex-girlfriend, Fenn, who testified against him.[26] In such a situation, a failure to object to prosecutorial misconduct calculated to cast Hodge in a negative light or to bolster Fenn's credibility is particularly likely to affect the jury's verdict. *See Strickland*, 466 U.S. at 695-96; *Washington*, 228 F.3d at 705; *see also Martin v. Parker*, 11 F.3d 613, 616-17 (6th Cir. 1993) (noting

---

[25]Although "interruptions of arguments, either by an opposing counsel or the presiding judge, are matters to be approached cautiously," *Young*, 470 U.S. at 13, this does not mean that no objection should ever be made. At a minimum, an attorney who believes that opposing counsel has made improper closing arguments should request a bench conference at the conclusion of the opposing argument, where he or she can lodge an appropriate objection out the hearing of the jury. *Id*. at 13-14. Such an approach preserves the continuity of each closing argument, avoids calling the attention of the jury to any improper statement, and allows the trial judge the opportunity to make an appropriate curative instruction or, if necessary, declare a mistrial. *See id*.; *Washington*, 228 F.3d at 706 n.10. We emphasize, however, that if an attorney's misconduct is sufficiently egregious, it is entirely appropriate for the trial judge "to interrupt the argument and admonish him," *Young*, 470 U.S. at 13 (citing *Viereck v. United States*, 318 U.S. 236, 248 (1943)).

[26]We note that we are particularly disturbed by the State's introduction of expert testimony improperly relying on (1) non-probative documents (the police reports and the bill of particulars) and (2) statements by complaining witness Fenn contained in the victim's medical records, to bolster the testimony of that same complaining witness. This strikes us as essentially allowing Fenn's contested testimony — the credibility of which was the key issue in the trial court — to bootstrap its way to scientific certainty. However, as we conclude that trial counsel's failure to object to egregious prosecutorial misconduct requires us to reverse Hodge's conviction, we need not decide whether the introduction of such blatantly improper expert testimony would support a grant of habeas corpus relief in a § 2254 proceeding.

heightened importance of appropriate prosecutorial conduct in sexual abuse cases).  Accordingly, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

### c.  Unreasonable Application Inquiry

Having concluded that counsel was ineffective in failing to object to the prosecutorial misconduct at issue in this case, we must now determine whether the state court decision "was not simply incorrect, but was objectively unreasonable, meeting even the high threshold required by the AEDPA."  *Washington*, 228 F.3d at 703; *see also* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  We conclude that the state court's decision was objectively unreasonable.

In regard to the prosecutor's comments on witness credibility, the state court completely failed to address the prosecutor's explicit statement of his personal belief that Hodge was lying and that Fenn was telling the truth.  *See Hodge I*, 2000 WL 1533917, at *7; *see also* J.A. at 189 (final closing argument by prosecution).  The court similarly failed to address the prosecutor's improper comments on the credibility of other witnesses.  Instead, the state court attempted to explain away these clear comments on witness veracity by stating that (1) they were made "in the context of contrasting the defense and prosecution witnesses," *Hodge I*, 2000 WL 1533917, at *7; and (2) "[t]he prosecutor did not claim to have personal knowledge of any witness's truthfulness."  *Id.* Both explanations lack merit.

The fact that the prosecutor's statements were made in the context of contrasting the defense and prosecution witnesses does nothing to reduce the impropriety of these statements — in fact, it is one of the reasons they qualify as prejudicial.  Although the prosecutor did not explicitly say "I have personal knowledge that one of these witnesses is lying and one is telling the truth," many of his comments — such as his statement that Hodge "is lying" and that Fenn "is absolutely believable," J.A. at 189 (final closing argument by prosecution) — carry the strong implication that they are made from personal knowledge.  Moreover, the state court failed to explain why two Supreme Court precedents which preclude prosecutorial comment on witness credibility did not apply in this case.  *See Young*, 470 U.S. 1; *Berger*, 295 U.S. 78.

In regard to the prosecutor's improper comments on witness credibility, we are unable to draw a relevant distinction between the comments on witness veracity prohibited by *Young* and *Berger* and the comments at issue in this case.[27]  As to the prosecutor's misleading statements, we note that both the false statement as to the content of Dr. Omley's testimony and the false statement that disbelieving Fenn would require disbelieving her great-grandmother and great-aunt went to the key issue in the case — whether to believe Fenn or Hodge.  With respect to the prosecutor's derogatory comments and bad-character arguments, we note that they were each completely unsupported by the evidence in the case or totally irrelevant to the issues involved.

As to the prosecutor's derogatory remarks and character-based arguments, the state court appeared to concede that these were improper.  *Hodge I*, 2000 WL 1533917, at *8.  However, the court relied on the prejudice prong of the *Strickland* inquiry, concluding that "even absent any possible prosecutorial misconduct, the jury would have found Hodge guilty."  *Id.* at *8.  The state

---

[27]We are also unpersuaded that the trial court's generic jury instructions, which made no specific reference to the prosecution's misconduct, were sufficient to dispel any prejudice from these statements.  *See* J.A. at 748 ("I want to remind you that the closing statements by the lawyers are not evidence.  They are an opportunity for each lawyer to summarize what they believe the evidence was and how it supports their respective position.") (given before closing arguments); J.A. at 753 ("[T]he opening statements and closing arguments of Counsel are designed to assist you but they are not evidence.") (given after closing arguments); J.A. at 754 ("The jury is the only judge of the facts, the credibility of the witnesses, and the weight of the evidence.") (given after closing arguments).

court made no effort to explain this conclusion, and we are unable to conceive of a reasonable explanation for that court's conclusion. As discussed above, derogatory statements and bad-character arguments are particularly likely to be prejudicial in a case, such as this one, depending almost entirely on a determination of whether the defendant or an accuser is a more credible witness. The prejudice prong of the *Strickland* test requires only a "reasonable probability," *Strickland*, 466 U.S. at 695, that, had a proper objection been lodged, the jury would have had a reasonable doubt as to Hodge's guilt.

Taken together, in a trial where the result depended almost entirely on the jury's determination as to whether Hodge or Fenn was more credible, the failure to object to these comments was highly prejudicial. Accordingly, we conclude that it was unreasonable[28] for the state court to conclude that there was no reasonable probability that, had proper objections been lodged (forcing the prosecutor to avoid repeating his improper arguments and suggesting to the court the need for specific curative instructions), the jury would have credited Hodge's testimony enough to create a reasonable doubt as to Hodge's guilt. Although it might be a reasonable application of *Strickland* for a state court to hold that statements such as these were not prejudicial in a case involving stronger evidence of guilt, we are unable to conclude that the state court's decision was a reasonable application of *Strickland* in this individual case. The district court erred in declining to grant habeas relief on Hodge's claim of ineffective assistance of trial counsel.

## III. CONCLUSION

We hold that Hodge's trial counsel was constitutionally ineffective in failing to object to egregious prosecutorial misconduct, and that the state court's determination to the contrary was an unreasonable application of clearly established Supreme Court precedent. The decision below is **REVERSED,** and the case is **REMANDED** to the district court with instructions that a conditional writ of habeas corpus, giving the State of Ohio ninety days to retry Hodge or release him from custody, be **GRANTED**.

---

[28] Our conclusion that the state court's application of *Strickland* was unreasonable, rather than merely incorrect, is driven by the extremely close nature of the credibility determination that was the key issue in this case. Had there been any basis, other than Fenn's eyewitness testimony, upon which a reasonable jury could have found Hodge guilty, we would be more hesitant to conclude that the state court's application of *Strickland* was unreasonable. However, as *Strickland* requires reversal when counsel's deficient performance results in "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt," *Strickland*, 466 U.S. at 695, our habeas inquiry is necessarily more searching in the context of a failure to object to prosecutorial misconduct affecting the key credibility determination.

**APPENDIX**

**[Initial Closing Made to the Jury on Behalf of the State of Ohio][29]**

[First page of argument missing from record] . . . . attempting to have sex with a three-year-old child. What could a child offer an adult male? But it has. There is no logic to it.

There is often not a logic to life, if you look at it from your point of view. Fortunately, I doubt if any of our lives are like Consuela's or the Defendant's. Although some of you have said you have participated in abusive relationships, until you understand the dynamics of a battered relationship you will never be able to understand what happened here. But remember, Consuela said this man beats her; he choked her; he held a pillow over her face until she was about to pass out; he took her keys, he held her captive in her own house; when she tried to lock him out he broke in. She felt that she could not escape from this guy. As one of her relatives said, she lost her self-esteem. When that happens, it's over. The dominator wins. He can control her whether he's there or not.

Although, you will find, as the testimony bears out, that people with this type of possessive personality don't want anyone to have any contact with this woman; this is their possession. They don't want them out without them, they're very jealous and physically violent, and they manipulate, and that's what he did.

And he moved into this house. He was not down here to live with his relatives like he claims. In fact, his own relatives dispute him when Sandra Jackson Hodge or Hodge Jackson says he was at Consuela's most — the majority of time, contrary to his own testimony. You'll find most of the witnesses contradicted him and contradicted each other.

Consuela didn't tell, she didn't deny it. She was physically beaten, she was afraid. She would be the first to admit it, and has, that she is ashamed of her conduct, didn't protect her child and she should have. But within 40 hours, she came forward to another relative who called the police, and either under the threat of being hounded, which is what happened, she came down there and she told what she saw.

Now, you'll hear time and time again she gave five statements. She didn't give five statements. She told the same thing maybe five times, and then on the 40th hour, about, *she told the whole truth*, which is in the — entirely consistent with what she said she did.

But there are things that support what Consuela has to say, that, you know, document that she is telling the truth, and *unless you decide that all of the women from her family, including her grand — great grandmother and great aunt are absolute liars, you know she is telling you the truth and she is supported in what she said 40 hours later.*

First of all, both Floncia Lovejoy and Barbara Lovejoy attended this party, and they saw a distinct change in [Jane]. And this change is something that all the doctors mention in their report, all the doctors testified to on the stand — well, I don't think Dr. Steiner put it in his report, but he did mention the changes on the stand. And she did change, she was no longer the outgoing child. Something had happened. She clung to her grandmother.

They obviously knew about this time her mother was not going to afford her a great deal of protection, and they made the decision to take her home. When going home, she made the statement that, "Daddy Demarkus is going to cut off my hair," that he threatened her. And he threatened her. She told he's going to cut her hair off. What did Floncia say when she combed her hair and bunches of it came out? He already pulled her hair, and he told her he'll pull the rest out or cut it off. She had injuries to her head, she said, "Daddy Markus is going to cut my hair," and the hair is falling out.

Shortly after arriving at her home, Floncia Lovejoy finds that she has an injury consistent with child abuse. There is no history of any type of her falling down and hurting herself. The Defendant himself admits that he, Consuela Fenn and the three children were the only people in the

---

[29]J.A. at 152-60 (emphases added).

house. It happened before the party. He has to be the responsible party, or the mother. There is no testimony to that; even the Defendant didn't go that far. Or it had to happen at the party, which nobody saw, and the child did not complain.

But now don't forget, she's saying, "Daddy Demarkus is going to cut my hair off." She's afraid of him. You probably saw that when she came in the courtroom.

There is blood in the underwear as a result of this wound that is consistent with a sexual assault. And when Consuela was brought back to view the injury for the first time, it is uncontradicted that she blurted out, "I didn't know it was this bad," which demonstrates that she did, in fact, have some prior knowledge that something happened to her daughter, and supports her statement. *And, more importantly, you have injuries which are consistent with fingertips about her chest*. She did not get those injuries as a result of falling on her genitalia in a straddle-type position.

Now, Consuela is not the only one that tells you *that that man battered her and is vicious*. You have, again, Floncia Lovejoy, Barbara Lovejoy, and in addition to that, Valerie Eisom, that says he is dominating, intimidating, and controlled her. Whether he was there or not. Floncia, she was afraid to tell. What do you have to back their testimony up? *You have his entire jail record*. Somebody is going to undoubtedly stand up here and say that's not so bad for being in the County Jail for a year. I dispute that it is bad. *If he is willing to intimidate corrections officers, assault police officers, what's he going to do to the likes of Consuela Fenn, who, for whatever reason, can't go out for some reason and fulfill her needs for attention or company with anything better than that.*

Some women are never able to get out of these relationships. They just stay there, and time and time again they come to court, despite all the police intervention, and say, "I want to drop the charges," even though they've been visibly assaulted. Sometimes they do this until they're eventually murdered. They never get out of the relationship. And some people, even if they're out, can't let go, and kill them for getting out.

Now, even Dr. Steiner, finally, after hours of cross examination, admitted that if you believe Consuela's eyewitness account then you should believe Dr. McDavid and you should rule this a rape, and find this as a rape. He concedes that.

To get around that issue, he [Dr. Steiner] severely discounts Consuela's history. He tells you he's not in a position to judge, he wouldn't do that, *and he tries to distance himself from the fact that he wrongfully discounts her story.* But we all know from his testimony and his report he is judging her; *he is ruling out her credibility even though out of the other side of his mouth he says he is not.* You read that report. He sat up there, I don't know how many times, and claims, based on what Dr. McDavid said, there were five statements, and because there were five statements, you should not believe the sixth. That's what he's saying. *That's just not credible*. He has conceded he did not have the information you have, he can't make that judgment as good as you, *and he is wrong, and you know that*. He has not heard everything you have heard. *He, I think wrongfully, has told you he's never even heard of a battered woman*, he's not in a position to evaluate that, that everyone that comes into his emergency room gives an accurate story, there is never a mistake in the date. This is how *he has manipulated the data to appear that he is giving a medical opinion that should not be permissible in court and isn't reliable. He is pretending to act within the confines of his field of practice when he gives this opinion,* but what he does is, he chooses to discount whether Consuela says there are, therefore there is no history, therefore it is improper to conclude child abuse. Well, if there were no history, you could not rule out child abuse. You cannot find probably child abuse, but you couldn't rule it out. But look at what he's doing and saying; both he and in his report say it's a straddle injury. But he didn't have a history. *Now he doesn't need a history, which is required by his profession to obtain a diagnosis of an accidental straddle injury*. But he discounts everybody else's use of a history to find sex abuse.

*Now, how can he do that ethically? He cannot*. And that's what Dr. Jackson just said. And in the same v[e]in, he came to this courtroom and, despite Nurse McAliley saying she has seen — a videotape of a young girl being penetrated, I think even 1000 times — a normal picture of the hymen, he comes in and tells you there can't be an inch and a half penetration of a prepubescent female vaginally without hymenal damage. *That's a lie*. Dr. Steiner says that is unethical, that is not the knowledge that they have today in this field. But yet he is telling you that. *So somebody*

*here has perjured themselves; it's ss either Nurse McAliley, Dr. McDavid and Dr. Jackson, or it's Dr. Steiner.*

I haven't heard that argument that there would be blood all over the place if an adult has sex with a young child, or 12 years. *I had one before in this courtroom, and I lost that trial because I was not ready to meet it like I was today.*

*They are attempting to purchase a verdict by creating doubt, by purchasing doubt.* But he is not testifying within the sum and substance of the knowledge within the field. *You can have vaginal intercourse without hymenal injuries.* However, in this case, we're not saying there is vaginal intercourse. Even Dr. Steiner conceded you could have penetration of the introitus, that area before the vagina starts, the penis is inside of the female, a young girl, but not actually penetrating the vagina, and in this state, as Dr. Steiner even admits, penetration, however slight, is enough.

*To find him not guilty, you have to find that Consuela Fenn and her whole family to be nothing but liars,* and to believe in what you heard from the Defense here. What you have to the contrary of that is a doctor who — *three people have unethically testified today, and I think you will know that's the case.* Him denying it, and a *family that barely knows him* comes in here saying he's not that kind of guy, *even though he got kicked out of school for fighting, and he was a horrendous prisoner. He knows no bounds.* You can see, unfortunately, from his family, *he has never been held responsible for anything.* Unfortunately, *his idea of supporting himself is getting my share of supplemental income or [a] share of my family's Social Security Supplemental [I]ncome.* He thinks the world, for some reason, owes him a good time. Unfortunately, he got bold enough to extend that to a three-year-old in our community, and that's against the law. That's a crime.

*I think if you consider the evidence today and you do not fall into the pit of purchased doubt,* you're going to find the State has an overwhelming case, and that [he] is, for whatever reason, *one of those people* — he can have sex with a three-year-old child. He raped [Jane], her mother saw it. He battered her, put her in a position where she had no self-esteem that he could do whatever he wanted with all of her possessions, and unfortunately that included [Jane]. Someone has to tell him that he's at the end of his free ride, that the laws do apply to him, and he's going to be held accountable. The State has given you the facts to do that. The Judge will give you the law. Return a verdict of guilty.

### Final Closing Argument Made to the Jury on Behalf of the State of Ohio[30]

Thank you.

I have heard several times today that the Defendant is a juvenile. He's been portrayed as the 16-year-old who's now been taken advantage of by Consuela Fenn who was 23 at the time. One thing is obvious: A legal determination has been made that he is not a juvenile. He should not answer as a juvenile because he's sitting here in adult court.

For another thing, he's on his own in the State of Ohio at the age of 16 without any parental supervision necessary. He's been kicked out of school. He has been able to maintain an adult sexual relationship with a 23-year-old who's now to blame for participating in this even though she had — he lied to her. Look at him. Is that a 16-year-old? That is not a juvenile.

Mr. Nagy asks you to put yourself in the place of an innocent person who might be accused, which I think is improper because you cannot identify with either one of these tables. *But how would you like to put yourself in the place of someone that might run into him at night?* As a juvenile? He is a juvenile in age only, and no other way, shape or form.

*To say that he is a slow learner I think may be considered an insult to your intelligence. He may not have done well in school, and apparently it's everybody else's fault that he didn't learn to read or write, and not his.*

But look at the life he's lead. He doesn't want for anything. He's managed to have a car to drive, he always manages to go to whatever states he wants to, he's always managed to have money

---

[30]J.A. at 180-90 (emphases added).

from whatever source, he has an adult sexual relationship. Depending on which relative you believe, he's either a hard-working person who was liked by everybody, or sits at home on his butt and watches videos all day.

He is not ineffective at getting what he wants to. Now, to say a [sic] Consuela Fenn has somehow taken advantage of him or should be charged with some kind of crime I think is not supported by the evidence in this case, and certainly not common sense.

Her uncontradicted testimony is that when she lied — he lied to her about his age. *And he certainly could pass for a 23-year-old. I wonder how many he's had to drink, in this period of emancipation, as an adult.*

And just as I predicted, Attorney Nagy has asked you to apply logic to this situation and infer that a mother would never tolerate this, or that if she did see it that she would logically tell at the first available moment. And he also discusses to you that she loved this guy and at one time wanted to marry him.

Well, those are parts of the dynamic of a battered woman in an abusive relationship. The relationship doesn't start as abusive. It's a progression, where the dominator's needs are progressively met more and more on a daily basis as the submissive person's self-esteem dwindles away until she is bereft and lonely and cannot think logically for herself.

It's only when you achieve that end, through the passage of time, and first you do that by fulfilling her needs for love and for some sort of security, and for helping her to raise her family, and to washing and clothing her kids, and after he sucks her in, as a result of being nice, he slowly turns and he begins to abuse her. And he begins to see just how much she'll take till he finally reaches the point where he realizes he can do anything he wants to her, or anything she owns he can take, her car, he can put a dog in her house she doesn't want. Even for a limited party, he can take her food, he can take her only set of keys, he can make her not see her family when he's not there, he can limit contact with her to the outside world, he can beat her and force her to conceal what he's done. He, in effect, owns her. When he gets bold enough to that point, he may just be bold enough to walk across the hall and take the rest of her possessions. Either to show her he truly is in charge and to hurt her, or because he is a pervert. It doesn't matter which. But that's what happened over a period of time, he destroyed her self-esteem.

Now, Mr. Nagy [defense counsel] makes light of the fact — or chastises the family for saying the child was ripped wide open because there's only a half-inch cut. Well, a half-inch cut in a two-inch vagina is pretty big. And if you look at the — obviously this opening is much bigger than a three-year-old would be, but Dr. Omley tried to draw proportionately the size of the cut, and it extends almost halfway, at least a third of the way lengthwise across her little vagina. Now, that might not be too unfair to say that it's wide open.

They also keep harping on the fact, *wrongfully*, that this is a statement that Consuela Fenn adopted, that the abuse occurred on the 21st and not the 22nd. It's one line written in by someone else. A social worker. Mr. Nagy did not show this to Consuela Fenn and offer her an opportunity. In fact, this was never mentioned till she was on and off the stand, and Dr. Steiner decided, even though he's not passing on the nurse's credibility, that he did consider that a statement of hers, then he claims that she adopted it later.

Now, there is no testimony that she looked at this, read that date, wasn't in a state of hysteria when this was done, or even acknowledged that; we don't know if the social worker, when you told me before that this, this and this was the truth, and never mentioned this date; we don't know if this one came in and misspoke on this one time. But yet you are offered this document as evidence, without it ever being shown to her, that this is one of these statements that should cause you to disbelieve what she has to say, and when she says eyewitnessed it, even though this was never shown to her. Now, you have to decide what that amounts to, but if you look at the same document, you will see the dates are correct in other places.

*Mr. Nagy says that Consuela was being investigated by Children Services. I didn't hear that in this trial. I don't know were that came from. I don't know why he feels he has to unfairly damage her reputation now, but apparently he does.*

He also says — and this is a great twisting of the facts, too. I mean, what's going on here? — Dr. Omley said there were no fingerprints. He [apparently referring at this point to defense counsel, who had just made his closing argument] told you he [apparently referring at this point to Dr. Omley] found there was handprints or fingerprints. *That's a lie.* You look at his report. *Dr. Omley said there was handprints*, but I asked him if he found bruises that would be consistent with the tension of fingers, and *he said yeah, and he notes bruises throughout the chest*, which supports what the family is saying, which destroys the straddle injury theory. And if you read Dr. Steiner's report, you'll find he has *wrongfully dealt* with these issues as well.

Now, Mr. Nagy also suggests to you that there is no — the State's case is not strong enough to be beyond a reasonable doubt, and he quotes the same language that every defense lawyer quotes in any trial, saying it's the most important of your own affairs and you should be firmly convinced, and that language is accurate.

But I would like to take a minute or two just to delve into that. Let's talk about buying a house, like Mr. Nagy said. I remember when I bought my first house with my wife, we sat, we budgeted, we budgeted, we calculated, we wondered if we could make the payment, could we afford this? The decision was fraught with doubt, but we decided we'd go ahead and we were going to chance it; we were firmly convinced but very leery of doing it.

Take an operation. Say you go to the doctor — and this may have happened to someone in your family — and you're feeling pretty good but you go for a checkup, and the doctor says, "You have a tumor. We have to get it out," or, "You're going to die," but you don't even feel bad. You go to a second doctor to get an opinion, he says the same thing. You know the risks of an operation. You feel great, you have not seen this thing but you're going to have your body cut open and have this thing yanked out. Risk, anesthesia, possible infection; not hopeful. You're full of doubt as to whether that thing's even in there, but you go ahead.

Now, in looking at him, and in hearing the evidence, and seeing Consuela, and seeing her family and everybody testify about all the facts that fit together, are you finally convinced this happened? I think so. Is there some doubt? Sure. But it's not a reasonable doubt. Consuela Fenn walked in on this man raping her daughter.

Where Mr. Nagy is getting this information from, or wants you to speculate that because she is so small that you can't — that you could no lay upon her with her legs open and cover her mouth, I don't know. We all know it's physically possible. The doctor, the only time that question was asked, said yes, it was possible. But yet he persists in that.

Consuela Fenn is a battered and beaten woman. As Dr. Jackson said, they don't — people don't always come in and report these things for a very long time. She came forward within 40 hours, even though she was scared to death of him. He controls her to this day. His actions demand that she come to court. His actions demand that she has to suffer this humiliation for failing her child. She did love him, she was in an abusive relationship, she did not tell right away. That does not make her a liar when you consider all the other factors that go with it, what her great grandmother and aunt observed.

Now, history is one thing. If Consuela Fenn was absolutely lying about this it would mean nothing, if she gave this story and there wasn't an injury consistent with it to back it up. She blurted out, "I don't know." It was that bad telling everybody. And that's uncontradicted, she knows something happened.

He asks — Mr. Nagy suggests it would be only logical she goes up to care for her. Well, that's not so logical. This man has manipulated and controlled her every step at this point; he owns her car; he owns her daughter, now he owns her.

He testified that he dressed her [Jane]. Do you think he's going to get this woman up there — that he just beat so she wouldn't tell — with this child after she's been caught? He's the one that dressed her, he's the one that went up there, he's not going to let her anywhere near her because she's going to freak out and tell. He handled it; he wanted to calm her down. She did not have the opportunity to go up and tend to her daughter.

Albeit, logically, she could have told and her family would have beaten him up right on the spot probably, if she would have told. But she didn't. That is a battered woman, or she would be out. No woman would ever be stuck in a battered relationship if they could see themselves logically.

She had waited 40 hours, *she told the truth*, and what she has to say is *supported by medical evidence* and all the surrounding family.

He has offered you nothing. He has tried to portray himself as a law-abiding, respectful, mild-mannered person. He is anything but that. He is uncontrollable; *he's not living with the family who he's supposed to be; he's been kicked out of school for fighting; he has the guts to fight with police officers*. He is not what he portrays himself to be, and that *is because he is lying to extricate himself from what he's done.*

*Consuela Fenn is absolutely believable, her family is absolutely believable.* It's just like the doctor says, "All of the pieces to the puzzle fit." By themselves none of them mean anything, the medical findings by themselves mean nothing, *the eyewitness account means nothing*, the battering itself means nothing. *But if you lump all of these things together and — his past behavior and conduct at the jail mean nothing, but if you put it all together, it proves the State's case beyond a reasonable doubt.* And if you piecemeal it like Dr. Steiner would like you to do, or discount parts of it, the State can't make its case. But if you logically, as your duty requires, consider everything and dig in and look as you promised, *you're going to know he's guilty.*

*Because if he were mild-mannered, he wouldn't have that problem at the jail. If he was mild-mannered, he wouldn't have been kicked out of school. If he wasn't domineering, she would have left him.* If he didn't own her, he would not have tried something as ridiculous as this at home while she was in the bathtub. But he is so used to controlling the people around him for his whole life, he can do anything he wants.

So he thought. Until today.

———————————

**DISSENT**

———————————

SILER, Circuit Judge, dissenting.   I do not think that the Ohio Court of Appeals unreasonably applied clearly established Supreme Court precedent under AEDPA, 28 U.S.C. § 2254(d)(1).  The majority correctly stated that the standard for ineffective assistance of counsel is clearly established in *Strickland v. Washington*, 466 U.S. 668 (1984), and that the Ohio Court of Appeals appropriately chose to apply *Strickland* when it denied relief in this case on direct appeal in *State v. Hodge*, No. 98CA007056, 2000 WL 1533917 (Ohio Ct. App. Oct. 18, 2000) (*per curiam*) (unpublished).

The majority also correctly quotes the application of the standard under 28 U.S.C. § 2254(d)(1) from *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  I suggest we add from that opinion that:

> [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

*Id.* at 411.  From this point on, my opinion diverges from the majority.

The majority finds ineffective assistance by counsel's failing to object during closing arguments to two types of statements by the prosecutor: (1) expressions of personal beliefs as to the veracity of witnesses, and (2) derogatory remarks about the defendant.  In the first category, the majority finds fault with the statements that Hodge was "lying to extricate himself from what he's done" and that "Consuela Fenn is absolutely believable, her family is absolutely believable."

On this question, the Ohio Court of Appeals was correct. The prosecutor was contrasting the witnesses for the prosecution and the defense.  They were not statements of personal belief.  The prosecutor did not say, "I know he is lying" or "I know Fenn is truthful."  These statements also came in rebuttal, after defense counsel had suggested that the whole case rested on the credibility of Fenn's testimony.

The majority is apparently offended by any references to lying or the truth in the summation by the prosecution.  It seems to be suggesting that in a close case, the use of those words calls for a conclusion of ineffectiveness when counsel does not object thereto.

For its authority, the majority cites, *inter alia*, *United States v. Young*, 470 U.S. 1, 17-19 (1985), and *Berger v. United States*, 295 U.S. 78, 86-88 (1935).  But the language in each shows the prosecutor's personal beliefs in a witness's testimony.  For instance, in *Young*, the prosecutor "told the jury that he was giving his 'personal impressions'" that the defendant intended to commit a fraud. *Young*, 470 U.S. at 17.  The Supreme Court found no reversible error, because the prosecutor was not suggesting "that he was relying on information outside the evidence presented at trial." *Id.* at 19.  Moreover, in *Berger,* the prosecutor argued his belief when he suggested he had personal knowledge of what a witness, Goldie Goldstein, knew when she testified. *Berger*, 295 U.S. at 87-88. There is no suggestion herein that the prosecutor had any inside knowledge when he said that Hodge was a liar and that Fenn was believable.  To successfully argue his case, the prosecutor must show the jury how it would find the guilt of the accused, and he must contrast the defendant's testimony with that of Fenn, the only eyewitness.  The prosecution had to make an argument in that vein, for a conviction required the jury to disbelieve Hodge.  It may not have been required to have believed

Fenn in order to find Hodge guilty, because there was some corroboration to her testimony, but defense counsel directed a lot of his argument against her credibility.

The majority cites to the cases of *United States v. Carroll*, 26 F.3d 1380, 1387, 1389 (6th Cir. 1994), and *United States v. Krebs*, 788 F.2d 1166, 1176-77 (6th Cir. 1986). *Krebs* criticizes the language by the prosecutor that "I want to suggest to you that in this trial testimony she was telling the truth . . . . Basically, she had no reason to lie." *Krebs*, 788 F.2d at 1176. In *Krebs*, defense counsel objected to the statements, but the district court did not admonish the jury, reasoning that it would "cause additional harm." *Id*. at 1177. Nevertheless, we said that "in the exercise of our supervisory powers," we had to determine whether the conviction "should be reversed because of the improper conduct of the prosecutor." *Id*. We concluded that the misconduct was harmless. *Id*. In contrast, we found in *Carroll* that the error was not harmless, although the "impropriety was not flagrant." *Carroll*, 26 F.3d at 1390. Of course, all of these cases cited by the majority were on direct appeal and under the supervisory powers of our court. This case, in contrast, comes as a habeas corpus petition and requires us to approach it as required under AEDPA.

The majority cites also to *State v. Smith*, 470 N.E.2d 883, 885 (Ohio 1984) (*per curiam*), that the prosecutor could not express his personal belief or opinion as to the credibility of witnesses or the guilt of the accused. But the Ohio Court of Appeals in this proceeding knew of that decision when it followed *State v. Mundy,* 650 N.E.2d 502, 520 (Ohio Ct. App. 1994), citing *State v. Price*, 398 N.E.2d 772 (Ohio 1979), and found, as in *Mundy*, that the prosecution was not expressing its personal opinion about the credibility of the witnesses.

The majority criticizes the argument by the prosecution in suggesting that the jury would have to find that all of the family witnesses would be liars, in order to acquit. That obviously is an exaggeration. However, the jury in this case was intelligent enough to know that most of the evidence came down to Fenn's testimony. Even defense counsel in his closing argument stated: "Mr. Rosenbaum is, again, correct, it comes down to one witness, Connie Fenn." Defense counsel was able to take advantage of the prosecution to show that some of the other testimony was not that material. He went on to state: "If you believed that witness, Connie Fenn, that she saw him raping the daughter, knowing all these other things you now know about her, her credibility, et cetera, then yep, you must find Demarkus Hodge guilty." There are few cases in which one would not find some part of a closing argument to be objectionable, especially in a volatile trial involving the rape of an infant.

The majority also finds ineffective assistance by defense counsel at trial in failing to object to certain derogatory remarks by the prosecution. I believe that the three remarks quoted by the majority were improper, at least in part, so the trial court should have sustained an objection to them, had objections been made.

The statement that Hodge could pass for a twenty-three-year-old is a valid argument, as the jury could see what he looked like. The part about "how many he's had to drink, in this period of emancipation as an adult," describes that he could pass as an adult. However, the clause that he may have drunk alcoholic beverages is objectionable, because it has no basis in the record, but it is relatively non-prejudicial.

The statement that Hodge's idea of supporting himself by getting "my share of supplemental income or [a] share of my family's Social Security Supplemental Income" makes little sense. I suppose it suggests Hodge was a welfare deadbeat. But, again, there is no basis in the record for that conclusion, so the remark was objectionable. Nevertheless, it has little or no prejudice attached to it, for Fenn herself may have been on welfare. Thus, if it suggests Hodge was not credible because he was a welfare deadbeat, it would likely apply also to Fenn.

The third remark: "[H]ow would you like to put yourself in the place of someone that might run into [Hodge] at night?" also was objectionable and was the closest to being prejudicial, but by itself or in conjunction with the other remarks, did not amount to prejudice sufficient to warrant a finding of ineffective assistance of counsel. The Ohio Court of Appeals found that the trial was fair and that even in the absence of any possible prosecutorial misconduct, the jury would have found Hodge guilty anyway. It also gave some weight to the trial court's instructions to the jury that counsel's statements were not evidence. Nevertheless, the issues before this court are not whether the prosecutor committed misconduct and whether the trial court erred. The issues are whether defense counsel was ineffective under the standards of *Strickland* and whether the Ohio Court of Appeals unreasonably applied *Strickland* to this case.

Hodge carries a heavy burden of proof here. In *Bell v. Cone*, 535 U.S. 685 (2002), the Supreme Court held:

> For [petitioner] to succeed, however, he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonably manner.

*Id*. at 698-99 (internal citations omitted). I do not believe that Hodge has carried that burden here.

As the majority does not discuss other issues raised, I also do not. However, assuming there were no other issues of merit raised, I would uphold the decisions of the magistrate judge and the district court in finding there is no basis for the issuance of a writ of habeas corpus, because the Ohio Court of Appeals did not unreasonably apply established Federal law under *Strickland*.